**Carlton GARY, Petitioner,**

v.

**Derrick SCHOFIELD, Warden, Respondent.**

No. 4:97–CV–181 (CDL).

United States District Court, M.D. Georgia, Columbus Division.

Sept. 28, 2004.

John Richard Martin, Michael Kennedy McIntyre, Atlanta, GA, for Petitioner.

Carlton Michael Gary, Jackson, GA, pro se.

Susan V. Boleyn, Atlanta, GA, for Respondent.

## ORDER

LAND, District Judge.

Petitioner, an inmate on death row at the Georgia Diagnostic and Classification Prison in Jackson, Georgia, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, the Court denies Petitioner's application for relief.

## I. BACKGROUND

### A. *Facts*

Between the fall of 1977 and spring of 1978, terror gripped the historic Wynnton neighborhood in Columbus, Georgia. Targeting elderly white women, an assailant sexually assaulted nine women, killing seven of them and leaving stockings around their necks as his calling card.[1] Labeled the "stocking strangler" by the local news media, the assailant suddenly ceased his activities in the Wynnton area in 1978 and eluded authorities for six years.

These crimes remained unsolved until 1984 when a pistol that was stolen from a home in the Wynnton area in October 1977 was linked to Petitioner. (Resp't Ex. 54 at 3247, 3265, 3388.) Petitioner was arrested on May 3, 1984 for this burglary. (Resp't Ex. 54 at 3338.) After acknowledging his *Miranda* rights, Petitioner confessed that he was present at the burglary and that he was either present at, or had knowledge of, eight of the nine 1977–78 Wynnton area

---

1. The nine victims were Ruth Schieble, Martha Thurmond, Kathleen Woodruff, Gertrude Miller, Mary "Fern" Jackson, Jean Dimenstein, Ruth Schwob, Mildred Borom, and Janet Cofer. Only Gertrude Miller and Ruth Schwob survived their attacks. Petitioner was indicted for raping, murdering, and bur- glarizing the homes of Schieble, Thurmond, and Woodruff. The Government introduced evidence of all nine attacks in support of these charges. Ms. Miller testified at Petitioner's trial. Ms. Schwob died before Petitioner's trial and never identified her assailant. (Resp't Ex. 53 at 3077.)

rapes and murders.[2] (Resp't Ex. 54 at 3337, 3341, 3357, 3369, 3371–73, 3375–76, 3379–80; Resp't Ex. 55 at 3429.) Petitioner stated that he burglarized these women's homes while an individual named Malvin A. Crittenden committed the rapes and murders. (Resp't Ex. 54 at 3359–60.) The authorities found no corroborating evidence linking Crittenden to the crimes.

Petitioner's fingerprints were ultimately found to match the latent prints found at four of the crime scenes.[3] (Resp't Ex. 50 at 2530–33, 2546, 2557–59, 2569–70; Resp't Ex. 51 at 2709–10, 2789–91, 2795; Resp't Ex. 52 at 2819–20, 2912–16, 2923.) Blood evidence and hair samples taken from the crime scenes were inconclusive-they did not establish Petitioner as the perpetrator, nor did they exclude Petitioner. (Resp't Ex. 55 at 3545–84; Resp't Ex. 57 at 3862–85.)

An investigation into Petitioner's background revealed his connection to similar crimes in the past. Specifically, on April 14, 1970, the body of eighty-five year old Nellie Farmer was found in her residence in Albany, New York. (Resp't Ex. 56 at 3596–97.) She had been raped, strangled, and her body was covered. (Resp't Ex. 56 at 3598–99, 3675–76.) A fingerprint taken at the scene matched Petitioner. (Resp't Ex. 56 at 3612, 3615.) When arrested and confronted with this evidence, Petitioner claimed that he was at the crime scene, but an individual by the name of John Lee Mitchell actually raped and killed Mrs. Farmer. (Resp't Ex. 56 at 3628–38.) Mr. Mitchell was acquitted of these charges. (Resp't Ex. 56 at 3648.)

On January 2, 1977, fifty-five year old Jean Frost was attacked and raped during a burglary of her home in Syracuse, New York. (Resp't Ex. 56 at 3684–88.) One of the items taken during the burglary was her watch. (Resp't Ex. 56 at 3688.) When Petitioner was taken into custody two days later, he had the watch in his pocket. (Resp't Ex. 56 at 3709–11.) Petitioner confessed to being the "lookout" for the Frost burglary. He claimed that an individual named Dudley Harris committed the attack and rape. (Resp't Ex. 56 at 3726.) Mr. Harris was not convicted for the crimes. (Resp't Ex. 56 at 3726.)

Regarding the Columbus "stocking strangler" crimes, Petitioner was indicted for raping, murdering, and burglarizing the homes of three of the nine victims-Ruth Schieble, Martha Thurmond, and Kathleen Woodruff. At trial, the Prosecution introduced evidence of the attacks on the other "stocking strangler" victims, claiming that they showed a similar pattern and were also committed by Petitioner. The evidence presented by the Prosecution to show a similar pattern included the following. All of the victims were elderly white women between the ages of 55 and 89. (Resp't Ex. 49 at 2274.) Each of the victims lived alone. (Resp't Ex. 49 at 2274.) In each crime, the assailant broke into the woman's home and burglarized her residence. (Resp't Ex. 49 at 2275.) With the exception of one, all of the crimes happened at night. (Resp't Ex. 49 at 2275.) All of the elderly women were sexually assaulted. (Resp't Ex. 49 at 2275.) All of the attacks involved ligature strangulation, usually with the victim's stockings or pantyhose. (Resp't Ex. 49 at 2276.) With the exception of only one attack, all of the attacks occurred in the Wynnton area of Columbus, Georgia. (Resp't Ex. 49 at 2276.) Every deceased victim had been either partially or totally covered after the attack. (Resp't Ex. at 2277.)

---

2. Petitioner denied any knowledge of the Mary Fern Jackson attack.

3. Matching prints were found at the Jackson, Scheible, Thurmond, and Woodruff crime scenes.

The evidence at trial showed that Mrs. Schieble was raped, beaten, and strangled to death with a stocking on October 21, 1977. (Resp't Ex. 50 at 2476–78; 2482–83; 2500–01, 2503.) She was eighty-nine years old at the time, legally blind, and could walk only with the aid of a walker. (Resp't Ex. 50 at 2468, 2495, 2500.) Mrs. Schieble's son and his wife discovered her lifeless, covered body on October 21, 1977. (Resp't Ex. 50 at 2776–78.)

Martha Thurmond's body was discovered on October 25, 1977. (Resp't Ex. 51 at 2664.) Her body was covered by a pillow, blankets, and sheets. (Resp't Ex. 51 at 2664.) The evidence showed that Mrs. Thurmond was sexually assaulted, beaten, and strangled with a stocking. (Resp't Ex. 51 at 2673, 2699–2701.)

On December 28, 1977, the body of seventy-four year old Kathleen Woodruff was discovered, partially covered, and lying on her bed. (Resp't Ex. 51 at 2735, 2749.) Mrs. Woodruff had been raped and strangled with a scarf. (Resp't Ex. 51 at 2735, 2749, 2757.)

The similar crimes evidence showed that Gertrude Miller was attacked on September 11, 1977. (Resp't Ex. 53 at 3001.) She was raped and severely beaten. (Resp't Ex. 53 at 3004.) Knotted stockings, similar to the ones used to strangle the other victims, were found at the scene. (Resp't Ex. 53 at 3026.) Mrs. Miller survived the attack and identified Petitioner as her assailant. (Resp't Ex. 53 at 3004–09.)

The body of fifty-eight year old Mary "Fern" Jackson was discovered on September 16, 1977. (Resp't Ex. 52 at 2891, 2895.) Her body was covered and she had been beaten and raped. (Resp't Ex. 52 at 2891, 2898.) Mrs. Jackson was strangled to death with a stocking and a sash from a dressing gown. (Resp't Ex. 52 at 2891, 2897, 2900–01.)

Seventy-one year old Jean Dimenstein was raped and strangled to death with a stocking in her home on September 24, 1977. (Resp't Ex. 52 at 2949, 2952–53, 2964, 2966–67.) Her body was covered with sheets and a pillow. (Resp't Ex. 52 at 2949, 2952.)

On February 11, 1978, police responded to a call and found Mrs. Ruth Schwob sitting on the edge of her bed with a stocking tied around her neck. (Resp't Ex. 53 at 3080.) Mrs. Schwob never identified Petitioner as her assailant. Although she survived the February 11, 1978 assault, she died before Petitioner was charged and tried. (Resp't Ex. 53 at 3077.)

On February 12, 1978, the body of seventy-eight year old Mildred Borom was found lying in a hallway of her home. She was lying on her back with her face covered. (Resp't Ex. 53 at 3107, 3114.) Mrs. Borom had been strangled with a venetian blind cord. (Resp't Ex. 53 at 3146, 3148.) She also had been raped. (Resp't Ex. 53 at 3148.)

On April 19, 1978, sixty-one year old Janet Cofer's body was found lying in her bed covered with linen and with a pillow over her face. (Resp't Ex. 54 at 3179, 3200, 3206.) Mrs. Cofer had been raped and strangled with a stocking. (Resp't Ex. 54 at 3218–19.) Although Mrs. Cofer did not reside in the Wynnton area of Columbus (as all of the other victims did), she had attended choir practice at the Wynnton Methodist Church on the evening of her murder. (Resp't Ex. 54 at 3184–85.) [4]

---

4. For the Georgia Supreme Court's summary of the relevant facts, *see Gary v. State,* 260 Ga. 38, 38–39, 389 S.E.2d 218 (1990). The Court notes that the Georgia Supreme Court opinion indicates that only *eight* victims were raped presumably because one victim was assaulted but not raped.

## B. Procedural History

### 1. State Court Proceedings

On May 4, 1984, Petitioner was indicted in the Superior Court of Muscogee County, Georgia on three counts of murder, three counts of rape, and three counts of burglary.[5] (Resp't Ex. 1.) Judge Kenneth Followill, the presiding judge in Petitioner's case, ordered Petitioner's trial to begin on March 10, 1986. (Resp't Ex. 2 at 677.) August F. Siemon was Petitioner's primary attorney both pre-trial and at his trial.

On March 10, 1986, the date set for trial, Petitioner filed a notice of his intention to raise the issue of mental incompetency. (Resp't Ex. 2 at 828.) On this same date, Petitioner also filed a "Special Plea of Incompetency." (Resp't Ex. 2 at 829.) In response, Judge Followill entered an "Order for Mental Evaluation re Competency at the Time of the Acts and Competency to Stand Trial." (Resp't Ex. 2 at 834.) Subsequently, the court conducted a competency trial and the jury found Petitioner competent to stand trial. (Resp't Ex. 14–21.)[6]

On June 10, 1986 and July 7, 1986, Petitioner filed motions to recuse Judge Followill from the case.[7] (Resp't Ex. 2 at 898–904, 932–37.) On July 21, 1986, Judge C. Cloud Morgan conducted a hearing regarding the recusal of Judge Followill. (Resp't Ex. 24.) On July 24, 1986, Judge Morgan entered an Order denying Petitioner's recusal motion. (Resp't Ex. 2 at 950.)

On June 18, 1986, Petitioner filed a motion for change of venue. (Resp't Ex. 2 at 905–12.) In an Order dated July 2, 1986, the court held that the trial jury would be selected in Spalding County, Georgia, of qualified jurors from that jurisdiction and that jury would be transported to Muscogee County, Georgia for the trial. (Resp't Ex. 2 at 913.)[8]

Petitioner went to trial on July 28, 1986 and the jury returned a verdict of guilty on August 26, 1986. (Resp't Ex. 2 at 957; Resp't Ex. 38–61.) On August 27, 1986, Petitioner was sentenced to death on the malice murder convictions. He also received sentences of life imprisonment on the rape convictions and 20 years imprisonment on the burglary convictions, all to run consecutively. (Resp't Ex. 2 at 958–69.)

Following Petitioner's trial and sentencing hearing, Petitioner filed a Motion for a New Trial on September 25, 1986. (Resp't Ex. 2 at 970.) The superior court denied

---

5. As explained above, Petitioner was indicted for raping and murdering Kathleen Woodruff, Florence Scheible, and Martha Thurmond.

6. Petitioner also filed a pre-trial habeas corpus petition in which he alleged incompetency to stand trial. *Gary*, 260 Ga. at 41, 389 S.E.2d 218. However, this issue was decided against him in this proceeding as well. *Id.* (Resp't Ex. 9.)

7. These were the third and fourth such motions filed by Petitioner. On February 8, 1985, Petitioner filed a motion to recuse Judge John Land, Chief Judge of Superior Courts, Chattahoochee Judicial Circuit. (Resp't Ex. 1 at 148–150.) Judge Land then filed a motion to recuse himself on May 7,

1985. (Resp't Ex. 1 at 243.) Judge E. Mullins Whisnant was assigned to the case. (Resp't Ex. 1 at 244.) On May 22, 1985, Petitioner filed a motion to recuse Judge Whisnant. (Resp't Ex. 1 at 245–250.) Judge Whisnant requested recusal on May 30, 1985. (Resp't Ex. 1 at 252.) Judge Followill was assigned to the case on May 30, 1985. (Resp't Ex. 1 at 253.)

8. In this procedural history, the Court has not attempted to list every pre-trial motion made and hearing held in the state trial court. It appears from the record that prior to his trial, Petitioner filed no less than eighty-six (86) various motions. The trial court conducted hearings on many of these motions.

this motion on October 6, 1986. (Resp't Ex. 2 at 974.)

Petitioner appealed his conviction and sentence to the Supreme Court of Georgia. On June 26, 1987, the Supreme Court of Georgia remanded the case to the Superior Court of Muscogee County with the following instructions: "The trial court is directed to appoint competent counsel to represent defendant for the purpose of a hearing which shall be conducted to determine if for any reason, including the lack of funds, the defendant failed to receive effective assistance of counsel." (Resp't Ex. 68.) Haywood Turner and Frank Derrickson represented Petitioner during the remand proceedings. (Resp't Ex. 73–75.) In its Order dated June 12, 1989, the remand court determined Petitioner "knowingly, intelligently, and voluntarily waived" the issues of effectiveness of counsel. (Resp't Ex. 78 at 27.)

Following the remand proceedings, the Supreme Court of Georgia affirmed Petitioner's convictions and sentence in *Gary v. State*, 260 Ga. 38, 389 S.E.2d 218 (1990). Petitioner filed a Motion for Reconsideration, which the court denied on March 28, 1990. (Resp't Ex. 84–85.)

The United States Supreme Court denied Petitioner's Writ of Certiorari on October 1, 1990 and denied a Motion for Rehearing of this decision on January 7, 1991. (Pet. Writ for Habeas Corpus at 3.)

### 2. State Habeas Corpus Proceedings

Petitioner then sought state habeas corpus relief in the Superior Court of Butts County, Georgia. On January 11, 1991, Petitioner filed his first state habeas corpus petition, which contained six claims for relief. (Resp't Ex. 92.) Petitioner filed his first amended habeas petition on June

20, 1994 and filed a second amended habeas petition, which contained thirty-two grounds for relief on June 24, 1994. (Resp't Ex. 129, 132.)

The superior court held evidentiary hearings and received into evidence a number of exhibits and affidavits. (Resp't Exs. 142–153.) The court denied habeas relief in a series of orders: two dated January 27, 1995 and one dated November 13, 1995 (Resp't Exs. 123, 135, 161). The Georgia Supreme Court denied Petitioner's application for a certificate of probable cause to appeal from the denial of state habeas corpus relief. (Resp't Ex. 166.) On May 27, 1997, the United States Supreme Court denied Petitioner's Application for a Writ of Certiorari. (Resp't Ex. 179.)

### 3. Federal Habeas Corpus Proceedings

On November 10, 1997, Petitioner filed in this Court his Petition for Writ of Habeas Corpus by a Person in State Custody Under a Sentence of Death.[9] (Doc. 7.) On February 2, 1998, Petitioner filed an amended petition in which he raised twenty-nine grounds for relief. (Doc. 10.) On December 29, 1997, Respondent filed an Answer–Response on Behalf of Respondent to Petitioner's Petition for a Writ of Habeas Corpus. (Doc. 9.) Additionally, Respondent filed amended answers on April 2, 1998 and September 5, 2001. (Docs. 13 and 60.)

#### a. Discovery

On February 16, 1999, Petitioner filed a Motion for Discovery. (Doc. 23.) Respondent responded to Petitioner's discovery motion and on December 9, 1999 the Court denied Petitioner's Motion for Discovery. (Doc. 32.)

---

**9.** When Petitioner filed his federal habeas corpus petition, Judge J. Robert Elliott was assigned to the case. Following Judge Elliott's retirement, the file was reassigned to Judge Hugh Lawson. On January 7, 2002, the case was reassigned to Judge Clay D. Land.

### b. *Evidentiary Hearing Regarding Semen Evidence*

On March 13, 2000, Petitioner filed a Motion for an Evidentiary Hearing regarding numerous issues. (Doc. 34.) On this same date, Petitioner filed a Motion for Access to Physical Evidence and Funds to Pay for Expert Assistance. (Doc. 35.) Respondent filed a response to both motions and in an Order dated June 30, 2000, the Court granted Petitioner's Motion for an Evidentiary Hearing only on the semen evidence at issue. (Doc. 41.) Specifically, the Court granted Petitioner's request to present evidence regarding certain recently obtained work papers from the Georgia Bureau of Investigation ("GBI") Crime Lab and their significance to the semen evidence in the case. (Doc. 41.) The Court denied Petitioner's motions in all other respects. (Doc. 41.)

Petitioner filed a Motion for Fees and Expenses of Necessary Experts on October 27, 2000. (Doc. 42.) In this motion, Petitioner requested the authority to retain the services of Roger Morrison, an expert forensic serologist. (Doc. 42.) Petitioner explained that he needed Mr. Morrison to review the semen evidence contained in the newly discovered GBI work papers and to provide testimony at the evidentiary hearing. (Doc. 42.) Petitioner also requested authorization to retain Dr. Robert Shaler, another forensic serologist. (Doc. 42.) After conducting a conference call to discuss Petitioner's motion, the Court entered an Order dated November 8, 2000 in which it authorized the payment of fees and expenses (of not more than $2,000.00) for Roger Morrison. (Doc. 43.)

On November 13, 2000, Petitioner filed a Motion for Authority to Take Semen Sample and Authorization to Pay for Testing of the Same. (Doc. 44.) The Court held an evidentiary hearing on November 21, 2000. Following that evidentiary hearing, the Court denied Petitioner's request for a semen sample in an Order dated June 29, 2001. (Doc. 56.) At the evidentiary hearing, Petitioner presented the testimony of his expert, Roger Morrison. (Doc. 47 at 50–116.) Respondent presented the testimony of John G. Wegel, Jr. (Doc. 47 at 117–188.) Both witnesses provided testimony regarding the Petitioner's blood type and his status as a secretor/non-secretor of blood group substances into his semen. Moreover, the experts presented testimony regarding whether Petitioner could be excluded as the donor of semen in the Jackson, Scheible, and Thurmond cases.

On May 24, 2001, Petitioner filed a Motion for the Receipt of Additional Evidence Regarding Secretor/Non–Secretor Issue and Renewal of Request for Independent testing of Petitioner's Semen. (Doc. 52.) On June 29, 2001, the Court entered an Order denying this motion. (Doc. 55.)

### c. *Procedurally Defaulted Claims*

On August 21, 2002, after the parties had thoroughly briefed the issues, the Court entered an Order finding that Petitioner had procedurally defaulted, or partially procedurally defaulted, eighteen of his claims for relief. (Doc. 77.) Petitioner filed a Motion for Reconsideration of August 21, 2002 Order. (Doc. 78.) In an Order dated October 28, 2002, the Court denied Petitioner's Motion for Reconsideration. (Doc. 83.)

### d. *"Bite Mark" Evidence*

On October 28, 2003, Petitioner filed a Motion to Secure Custody of Critical Evidence. (Doc. 106.) In this motion, Petitioner stated that he recently learned that a bite mark cast made of the left breast of Mrs. Janet Cofer may still be in existence and in the possession of Karen Kilgore, the widow of the former Muscogee County Coroner Don Kilgore. Petitioner requested that the Court issue a subpoena duces

tecum or enter an Order directing Karen Kilgore to produce the cast. (Doc. 106.)

The Court held an initial hearing regarding Petitioner's motion on November 10, 2003. (Doc. 119.) At this hearing, the Court authorized the issuance of subpoenas to Karen Kilgore and her two stepdaughters, Jeannie Kilgore Hackaday and Joannie Kilgore Warden. (Doc. 119.)

Mrs. Kilgore, Mrs. Hackaday, and Mrs. Warden attended an evidentiary hearing held on November 25, 2003. (Doc. 120.) Additionally, Mrs. Warden's husband, Jack Warden, attended this hearing. (Doc. 120.) All four of these witnesses testified that they never had possession of the bite mark cast and that they did not have any idea about the current location of the cast, or even if it was still in existence. (Doc. 120.) Additionally, on December 22, 2003, Henry Warden, son of Joannie and Jack Warden, testified that he saw the bite mark cast eight to ten years ago, but he never had possession of the cast and had no idea where it might be located. (Doc. 121.) No evidence was presented to suggest that the bite mark cast still existed or could be located.

On December 15, 2003, Petitioner filed a Motion for Evidentiary Hearing Regarding the State's Conduct in Preventing the Petitioner Access to the Bite Mark Evidence. (Doc. 117.) In an Order dated April 2, 2004, the Court denied this motion. (Doc. 125.)

Presently before the Court are Petitioner's claims for relief that have not been procedurally defaulted or abandoned by Petitioner.[10]

## II. DISCUSSION

### A. Standard of Review

When a habeas petitioner's claim has been adjudicated on the merits in the state court proceedings, a federal district court can grant federal habeas relief only when the state court's decision:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).[11]

"A state-court decision is *contrary to* th[e] [Supreme] Court's precedent if the state court arrives at a conclusion opposite to that reached by th[e] Supreme Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court

---

**10.** Petitioner has failed to brief four grounds for relief that were contained in his amended habeas corpus petition and that were not procedurally defaulted. These grounds for relief are as follows: Ground Five—Prejudicial Publicity; Ground Six—Voir Dire and Juror Excusal Violations at Trial; Ground Ten—Improper Admission of Statements of Petitioner that were Involuntarily Obtained; and Ground Twenty–Seven—The Death Penalty Scheme in Georgia is Arbitrary and Capricious. Petitioner's Merits Brief Regarding Grounds for Relief not Found to be Procedurally Defaulted is 215 pages long, not including attachments. His reply brief is 44 pages long. The Court assumes that Petitioner has thoroughly briefed all of the issues that he desires to pursue. Issues not briefed by Petitioner (Grounds Five, Six, Ten, and Twenty–Seven) are deemed abandoned and will not be addressed further by the Court. *See Isaacs v. Head,* 300 F.3d 1232, 1253 (11th Cir.2002); *United States v. Ardley,* 242 F.3d 989 (11th Cir.2001).

**11.** Petitioner filed his Petition for Writ of Habeas Corpus in this Court on February 2, 1998, which was after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore his case is governed by AEDPA.

precedent and arrives at a result opposite to [the Supreme Court]." [12] *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A federal district court cannot substitute its opinion for that of the state court. "A state court's decision that applies the law as determined by the Supreme Court to the facts is not 'contrary to' whether or not the federal court would have reached a different result." *Carr v. Schofield,* 364 F.3d 1246, 1250 (11th Cir.2004)(quoting *Fugate v. Head,* 261 F.3d 1206, 1216 (11th Cir.2001), *cert. denied,* 535 U.S. 1104, 122 S.Ct. 2310, 152 L.Ed.2d 1065 (2002)). Moreover, if there is no Supreme Court precedent on point, " 'the court cannot say that the state court's conclusion . . . is contrary to clearly established federal law as determined by the United States.' " *Henderson v. Campbell,* 353 F.3d 880, 890 (11th Cir.2003)(quoting *Isaacs v. Head,* 300 F.3d 1232, 1252 (11 th Cir.2002)).

A state court decision "involve[s] an unreasonable application of clearly established Federal law" when the "decision . . . correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case . . . ," *Williams,* 529 U.S. at 407–408, 120 S.Ct. 1495 (quoting 28 U.S.C. § 2254(d)(1)), or if the state court decision " 'identifies the correct governing [Supreme Court] legal principle . . . but . . .'refuses to extend the governing principle to a context in which the principle should have controlled.' " *Carr,* 364 F.3d at 1250 (quoting *Ramdass v. Angelone,* 530 U.S. 156, 166, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000)). When making the "unreasonable application" inquiry, this Court need not decide if it

"would have reached the same result as the state court if [it] had been deciding the issue in the first instance." *Wright v. Secretary for the Dep't of Corr.,* 278 F.3d 1245, 1256 (11th Cir.2002). The Court merely "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. 1495.

In addition to the two narrow "contrary to" and "unreasonable application of" prongs authorizing federal habeas corpus relief, Petitioner is also entitled to relief if the state court's conclusion is based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Henderson,* 353 F.3d at 890 (quoting 28 U.S.C. § 2254(d)(1) and (2)). However, it is axiomatic that "review of a state court's judgment in a habeas corpus proceeding is governed by a 'highly deferential standard of review for factual determinations made by a state court.' " *Carr,* 364 F.3d at 1250 (quoting *Fugate,* 261 F.3d at 1215). "The State court's determinations are 'presumed to be correct' and the [Petitioner] bears 'the burden of rebutting the presumption of correctness by clear and convincing evidence.' " *Id.* (quoting 28 U.S.C. § 2254(e)). Additionally, the federal court must give deference to the state court's determinations regarding credibility. *Baldwin v. Johnson,* 152 F.3d 1304, 1317 (11th Cir.1998).

■ The Court observes that 28 U.S.C. § 2254(d) applies only to claims that the state courts have "adjudicated on the merits." If the state courts did not decide the issue, then no deference is required as the federal courts cannot "defer to that which

---

**12.** The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decisions." *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

[does] not exist." *Wright*, 278 F.3d at 1254 (11th Cir.2002). Consequently, if the claim was presented to the state court but the state court did not rule upon it, then the federal habeas court must resolve the claim *de novo*.

In an Order dated August 21, 2002, the Court determined that eighteen of Petitioner's claims were procedurally defaulted or partially procedurally defaulted. (Doc. 77.) The remaining claims are discussed below using the appropriate standard of review.[13]

### B. Petitioner's Remaining Claims

#### 1. Petitioner's Competence to Stand Trial

Petitioner contends in Ground One of his petition that he was incompetent to stand trial and the proceedings that found him competent were constitutionally defective. Petitioner states that he was held in solitary confinement from the time of his arrest in May 1984 through March 1986 and from April 1986 through the conclusion of his trial in August 1986. According to Petitioner, solitary confinement "had dire and deteriorating effects on [his] ... mental health and led, ultimately, to his inability to understand the charges and proceedings against him and to consult rationally with his counsel and assist in his defense." (Doc. 96 at 211.)

Petitioner acknowledges that this claim was raised and rejected on direct appeal to the Supreme Court of Georgia and, therefore, 28 U.S.C. § 2254(d) is applicable.

On direct appeal, the Georgia Supreme Court rejected Petitioner's claim that he was mentally incompetent to stand trial as follows:

The defendant contends the conditions of his solitary confinement while awaiting trial had an adverse impact on his ability to stand trial. However, not only has this issue been litigated—and relief denied—in a pre-trial habeas corpus petition filed by the defendant on this issue, but also in a special trial to determine his competence to stand trial. The special jury found him competent to stand trial. *See* O.C.G.A. § 17–7–130.

While awaiting his trial, the defendant was held in "administrative segregation" for his own protection. He was in a private cell with a commode, a lavatory, a bunk with mattress, blanket and pillow, a skylight, a television, a radio, and reading materials. He was given extensive visitation privileges. The record does not support the defendant's claim of unconstitutionally harsh conditions of confinement. The special jury's finding that he was competent to stand trial is supported by the evidence.

*Gary,* 260 Ga. at 41, 389 S.E.2d 218.

Petitioner contends that the clearly established federal law on the issue of competency to stand trial is *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). In *Drope,* the Supreme Court explained that "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope,* 420 U.S. at 181, 95 S.Ct. 896.

Petitioner apparently faults the Georgia Supreme Court for not specifically citing *Drope.* However, the United States Supreme Court has explained that a state

---

**13.** The Court uses the same number for each ground as used by Petitioner in his briefs. Since some of the grounds have been procedurally defaulted and are, therefore, not dis-

cussed in this section of the Order, the numbering of the grounds included in this section of the Order will not be precisely sequential.

court's opinion is not "contrary to" established federal law simply because the state court does not cite the Supreme Court opinion. In *Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002), the Court explained as follows:

> A state-court decision is "contrary to" our clearly established precedents if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." ... **Avoiding these pitfalls does not require citation to our cases—indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.**

*Id.* at 8, 123 S.Ct. 362 (quoting *Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495)(emphasis added).

■ In this case, the Georgia Supreme Court's reasoning, and ultimate decision on the issue of Petitioner's competency to stand trial, does not contradict, nor is it an unreasonable application of, *Drope*. As the Georgia Supreme Court noted, both in a pre-trial habeas petition and in a special competency trial held before a jury, the issue of Petitioner's competency was litigated, and both the judge and jury rejected Petitioner's mental incompetency claim. (Resp't Ex. 2 at 829; Resp't Ex. 9 and 14–21.) Thus, the trial court was certainly "alert to" Petitioner's competency. *Drope*, 420 U.S. at 181, 95 S.Ct. 896. Moreover, the state court's finding of competency is entitled to deference and a presumption of correctness under AEDPA. *Carr*, 364 F.3d at 1250. Petitioner has offered nothing to rebut this presumption and to show that the Georgia Supreme Court's decision was contrary to, or an unreasonable application of, *Drope*. Additionally, Petitioner

has not maintained or shown that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence present in the [s]tate court proceedings." 28 U.S.C. § 2254(d)(2). As such, Petitioner is not entitled to relief on this claim.

### 2. *Alleged Batson Violation at the Competency Hearing*

Ground Three of Petitioner's petition alleges that his rights under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), were violated at his competency hearing. In an Order dated August 21, 2002, this Court ruled that Petitioner raised his *Batson* claim in a second brief and enumeration of error on direct appeal, but the Georgia Supreme Court failed to rule on the claim. (Doc. 77 at 6–9.) Therefore, this Court found that Petitioner's claim of a *Batson* violation at his competency hearing was not procedurally defaulted. (Doc. 77 at 9.) *See Hutchins v. Wainwright*, 715 F.2d 512 (11th Cir.1983).

Because Petitioner's *Batson* claim was not "adjudicated on the merits" by a state court (*See* Aug. 21, 2002 Order, Doc. 77 at 9), § 2254(d)(1) and (d)(2) do not apply and this Court must review this claim *de novo*. *Wright*, 278 F.3d at 1253–54 (explaining that if there is no state court decision on the merits, the claim must be reviewed without any § 2254 deference).

■ Respondent maintains that *Batson* does not apply in this case because *Batson* was pending in the Supreme Court at the time of Petitioner's competency trial, which was held on April 21–28, 1986.[14] In *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Supreme Court held "that a new rule for the conduct of criminal prosecutions [i.e., *Bat-*

---

**14.** *Batson* was decided on April 30, 1986.

*son*] would be applied retroactively to all cases, state or federal, pending on direct review **or not yet final.**" *Id.* at 328, 107 S.Ct. 708 (emphasis added). The Court defined "final" to mean "a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." *Griffith,* 479 U.S. at 321, n. 6, 107 S.Ct. 708. Under this definition, Petitioner's case was not "final" when *Batson* was decided on April 30, 1986 and *Batson* would, therefore, apply. *Griffith,* 479 U.S. at 328, 107 S.Ct. 708.

■ Pursuant to *Batson,* it is Petitioner's burden to establish a *"prima facie* case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson,* 476 U.S. at 93–94, 106 S.Ct. 1712. Petitioner argues that he established a *prima facie* case of discrimination against African American jurors when he objected because the State "utilized seven of its eight peremptory strikes against African American jurors, striking a Caucasian juror only when there were no more African American jurors to strike." (Pet'r May 20, 2003 Br. at 274.)

However, this is not what the record shows. The record does show that the State used six of its peremptory strikes to strike African American jurors and one of its peremptory strikes to strike a Caucasian female. (Resp't Ex. 18 at 681.) Contrary to Petitioner's assertions, however, the State did not strike all potential African American jurors; three African Americans served on the jury of Petitioner's competency trial. (Resp't Ex. 18 at 681.)

Petitioner cites *United States v. Gordon,* 817 F.2d 1538 (11th Cir.1987) to support his position that he established a *prima facie* case of racial discrimination. However, the record in *Gordon* showed, "the Government exercised its six peremptory challenges to remove every black venireperson from Gordon's jury [and][t]hose peremptory strikes followed a recurrent pattern of exclusions of black venirepersons in the Government's other voting fraud cases against black leaders." *Id.* at 1541. In contrast, in the current case, the State did not use its strikes to remove every African American from the jury at Petitioner's competency hearing and, in fact, three African Americans served on the jury.

Even if Petitioner established a *prima facie* case of racial discrimination, the State articulated neutral criteria for the exercise of its peremptory strikes. Specifically, the Prosecutor explained as follows:

> Some [of the excluded African American jurors] had fixed opinions as to the Defendant's innocence. One had two relatives who had been convicted of crimes. Another one that was openly, what we felt like was antagonistic toward [the Prosecutor] during voir dire, and who attended church with an individual we felt like would in fact be a witness for the Defense in this case.

(Resp't Ex. 18 at 681–82.)

As is required by *Batson,* the Prosecutor offered "a neutral explanation related to the particular case to be tried." *Batson,* 476 U.S. at 88, 106 S.Ct. 1712. The trial court then found that Petitioner's motion for a mistrial made under *Batson* should be denied. (Resp't Ex. 18 at 681–83.) This finding by the trial court is entitled to "great deference." *Batson,* 476 U.S. at 98, 106 S.Ct. 1712 (explaining that "[s]ince the trial judge's findings in this context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference").

No violation of *Batson* occurred at Petitioner's competency hearing. Therefore, he is not entitled to relief on this ground.

### 3. *Alleged Batson Violation at Trial*

In Ground Seven of his petition, Petitioner maintains that a *Batson* violation occurred at his trial. In its August 21, 2002 Order, this Court found that Petitioner's claim of a *Batson* violation at his trial was not procedurally defaulted because Petitioner raised this claim in his second brief and enumeration of error on direct appeal, but the Georgia Supreme Court failed to rule on the claim. (Doc. 77 at 9.) Since the state court did not address this issue, this Court reviews the claim *de novo*. The Court rejects Respondent's contention that *Batson* is not applicable to the trial proceedings, which occurred immediately after *Batson* was decided.[15] *Batson* applies to Petitioner's trial for the same reasons that the Court found it applied to his competency hearing.

The record reveals that there were fifty-eight potential jurors, eleven of whom were African American. (Resp't Ex. 46 at 1932.) The State used a total of thirteen strikes, and six of those strikes were used against African Americans. (Resp't Ex. 46 at 1932.) Based on these numbers, Petitioner objected under *Batson* and the trial court explained that it did "not really think that a *prima facie* case was made out," but it asked the State to respond. (Resp't Ex. 46 at 1950.)

The Prosecutor then articulated race neutral criteria for the exercise of its six peremptory strikes that were used to strike African Americans from the jury. Specifically, the Prosecutor responded to the *Batson* challenge by stating for the record that Juror Number 12, Nina R. Ambles, "was very weak on the death penalty." (Resp't Ex. 46 at 1935.) Moreover, she was not able to tell them for whom her husband worked, and she did not know what the term "victim" meant. (Resp't

Ex. 46 at 1935–36.) The Prosecutor stated that he did not think that she would understand the technical, scientific testimony and evidence in the case. (Resp't Ex. 46 at 1935–36.) The Prosecutor also explained that her attendance at voir dire had forced her to miss a planned trip to Canada and he was afraid that she might take it out on the State. (Resp't Ex. 46 at 1936.)

As to Juror Number 20, Daisy McDonald, the Prosecutor explained that he struck her because she was weak on the death penalty, indecisive, and her son had been convicted of aggravated assault. (Resp't Ex. 46 at 1937.)

The Prosecutor stated that he struck Annie Ruth Owens because she was hesitant and unable (or unwilling) to answer a number of questions. Moreover, the Prosecutor explained that Ms. Owens was in the midst of planning a wedding for her daughter, which wedding was to take place during the trial. (Resp't Ex. 46 at 1937–38.)

Regarding juror Henry G. Reid, the Prosecutor stated that he was weak on the death penalty as evidenced by the fact that Mr. Reid stated he would not impose the death penalty unless he was "convinced beyond a shadow of a doubt." (Resp't Ex. 46 at 1939.) Also, Mr. Reid had a cousin charged with murder in Fulton County at the time of voir dire. (Resp't Ex. 46 at 1939.) The Prosecutor also explained that Mr. Reid expressed that he had heard the rumor that Petitioner's prosecution was a "cover-up." (Resp't Ex. 46 at 1939, 1946.)

The Prosecutor stated that the State struck Angie E. Smith because she was weak on the death penalty and because her answers appeared to be given in a way to be agreeable with the court. Moreover,

---

**15.** As explained previously, *Batson* was decided on April 30, 1986. Voir dire proceedings in Petitioner's case started on June 9, 1986 and the trial started on July 28, 1986.

she misspelled many answers on her juror questionnaire and the Prosecution felt that she would not be able to understand the technical and scientific evidence relating to the blood and fingerprints. (Resp't Ex. 46 at 1940.)

Finally, the Prosecutor explained that Jessie P. Ham was struck because she stated that she "would give life," and she expressed reluctance to serve on the jury. She stated on her juror questionnaire that her high blood pressure would interfere with her serving on the jury. However, when asked to explain, she testified that she merely took a vitamin to regulate her blood pressure. The Prosecutor also stated Ms. Ham misled the court on her questionnaire in that she failed to inform the court that her son was a former police officer who had been fired from the police force. (Resp't Ex. 46 at 1942–43.)

After hearing the race-neutral reasons for striking these six African American venirepersons, the trial court found that "the Prosecutor has articulated a neutral explanation related to the case, and I would determine from the explanation given that the Defendant has failed to establish purposeful discrimination." (Resp't Ex. 46 at 1950.) Therefore, the court denied Petitioner's *Batson* motion.

The trial court's findings are due "great deference." *Batson*, 476 U.S. at 98, 106 S.Ct. 1712. Based on a thorough review of the record, this Court finds that the trial court correctly applied *Batson* and Petitioner is not entitled to habeas relief on this ground.

### 4. The Trial Court's Denial of Funds

In Ground Eight of his petition, Petitioner contends that the trial court improperly denied his motion for funds for an adequate defense. On direct appeal, the Supreme Court of Georgia explained as follows:

In his post-remand brief, the defendant continues to claim, as he did in his original appellate brief, that the trial court's refusal (prior to the original trial) to appoint additional counsel or to provide funds for forensic and investigative assistance was an abuse of discretion, *see Isaacs v. State*, 259 Ga. 717, 386 S.E.2d 316 (1989), and that he was penalized improperly for exercising his right to retain his own attorney pro bono.

The defendant was given the opportunity to prove that the denial of funds for legal, investigative, and forensic assistance prejudiced his defense; i.e., that because of the trial court's denial of funds, attorney Siemon could not effectively represent his client. The defendant waived that opportunity, and we need not further address his contentions in this regard.

. . . .

The defendant contends he was denied due process by the court's refusal to grant him funds for examination by an independent mental health expert. *See Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). We disagree. Nothing before the court reasonably indicated that the defendant's sanity would be a significant factor at trial. The denial of funds was not error. *Gary*, 260 Ga. at 40–41, 389 S.E.2d 218.

Additionally, at the state habeas level, Petitioner argued that the trial court's denial of funds denied him his due process rights. Specifically, Petitioner maintained "that his motions for funds to employ fingerprint experts, hair and fiber experts, serological experts, hypnosis experts, forensic odontologists, media experts, racism experts, mental health experts and a private investigator should have been granted by the trial court." (Resp't Ex. 161 at 5.) The state habeas court held as follows:

The United States Supreme Court held in *Ake* that where a criminal defendant "has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." ... The Court went on to state specifically that fundamental fairness does not require the state to "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy...." Fundamental fairness does require however, that defendants be given "an adequate opportunity to present their claims fairly within the adversary system." ... Cases following *Ake* have interpreted the dictate of fundamental fairness to require that a defendant be provided with expert assistance where he has shown that such is necessary and that without it his trial would be rendered unfair.... Such necessity is not shown "merely by noting that the defendant's attorney is not himself an expert and suggesting in general terms that a defense expert could help the defendant cross-examine the state's expert."

....

After a review of the extensive record in this case, this court finds that the trial judges' denial of funds did not render petitioner's trial fundamentally unfair and did not violate his due process rights. In the initial hearing on the matter of funds for representation of Gary, Mr. Siemon stated: "I have the personal resources to provide representation for [the Petitioner]." ... Although Mr. Siemon now attempts to disavow this comment in his affidavit to this court, it is clear from the transcript of the hearing that this statement was made by Mr. Siemon and was not taken out of context by the Georgia Supreme Court. Based on this representation by Mr. Siemon, this court does not find any abuse of discretion by Judge Land in denying further funds for the defense. "[A]fter a thorough review of the record in this case, this court finds that the trial judge's denial of funds did not render petitioner's trial fundamentally unfair and did not violate his due process rights."

Additionally, at the July 1985 hearing on this issue before Judge Followill, the defense stated that it should be given at least equal resources for the defense as the state had for the prosecution.... Clearly under the law the defense is not entitled to the same funding the State might have. Furthermore, a review of the trial transcripts in this case shows that, despite Mr. Siemon's assertions to the contrary, all of the State's experts were subjected to a thorough and penetrating cross examination by the defense, and the defense was given ample opportunity to present its claims and raise doubts about the expert opinions offered by the State. Based on the record in this case, this court finds that Judge Followill's denial of funds for the defense was not an abuse of discretion.

(Resp't Ex. 161 at 6–7) (citations omitted).

Petitioner currently complains he was denied his rights under *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) to the assistance of the following experts: (1) a fingerprint expert; (2) a hair and fiber expert; (3) a hypnosis expert; (4) a forensic odontologist; and (5) a serological expert. Since Petitioner unsuccessfully raised these claims during his state habeas corpus proceedings, Petitioner must show that the decision of the state habeas corpus court was "contrary to, or ... an unreasonable application of, clearly established" United States Supreme Court precedent, or "based on an unreasonable determination of the facts in light of the

evidence." *Hightower v. Schofield*, 365 F.3d 1008, 1014 (11th Cir.2004)(quoting 28 U.S.C. § 2254(d)).[16]

Petitioner maintains that the "clearly established Federal law" is *Ake*. 28 U.S.C. § 2254(d). In *Ake*, the Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Ake*, 470 U.S. at 74, 105 S.Ct. 1087. The holding in *Ake* is limited to psychiatric assistance. *Conklin v. Schofield*, 366 F.3d 1191, 1206 (11th Cir.2004). However, the Eleventh Circuit has assumed, but never specifically held, that the "due process clause could require the government to provide non-psychiatric expert assistance to an indigent defendant upon a sufficient showing of need." *Id.* This Court therefore finds *Ake* applicable to non-psychiatric experts.

### a. Fingerprint Expert

■ Petitioner maintains that he was denied his right under *Ake* to the assistance of a fingerprint expert. It does appear that Petitioner made a timely request for expert examination of the fingerprint evidence. As early as June 20, 1984, Petitioner's counsel filed a "Motion for Scientific Examination of Physical Evidence." (Resp't Ex. 1 at 42.) In this motion he requested to have an independent scientific examination of all fingerprints lifted at the various crime scenes. (Resp't Ex 1 at 42.) In June 1985, Petitioner filed another motion requesting the appointment of a fingerprint expert. (Resp't Ex. 1 at 260.) Additionally, during his trial, Petitioner

objected and requested funds when the State presented its fingerprint experts. (Resp't Ex. 50 at 2543, 2552, 2555, 2567; Resp't Ex. 51 at 2721; Resp't Ex. 52 at 2818.)[17]

The trial judge denied all of Petitioner's motions and requests for a fingerprint expert and this ruling was upheld by the state habeas court. The issue, therefore, is whether the state court's ruling, which upheld the trial court's denial of funds for a fingerprint expert, was contrary to, or involved an unreasonable application of, Supreme Court precedent. This Court is mindful that when making these determinations it does not decide if it "would have reached the same result as the state court if [it] had been deciding the issue in the first instance." *Wright*, 278 F.3d at 1256. The Court must accord deference to the state court's opinion.

The state habeas court did apply the applicable Supreme Court precedent, i.e. *Ake*, to Petitioner's claim. Therefore, the state court's decision was not "contrary to ... established federal law." 28 U.S.C. § 2254(d)(1). Additionally, this Court cannot say that the state habeas court's decision—that the "the trial judges' denial of funds did not render petitioner's trial fundamentally unfair and did not violate his due process rights"—was an unreasonable application of federal law. (Resp't Ex. 161 at 6–7.)

The Court observes that even without expert assistance Petitioner's trial counsel was able to cross-examine the Prosecution's expert witnesses. Petitioner's trial attorney was able to show that, in many instances, the experts did not know exactly

---

16. As explained below, due to the discovery of evidence while the case was pending in this Court, the Court does not apply AEDPA's deferential standard of review to Petitioner's claim regarding lack of funds for a serological expert.

17. The State presented evidence that the fingerprints found at the Jackson, Scheible, Thurmond, and Woodruff crime scenes matched those of Petitioner.

from where the latent prints came, did not know how many people had been present at the homes in question, and did not know how long the latent prints had been on the surfaces in question. (Resp't Ex. 50–55.) Petitioner's counsel also pointed out during cross-examination of these experts that in some instances the State waited fourteen months following Petitioner's arrest to compare the latent prints to his fingerprints. (Resp't Ex. 51 at 2729; Resp't Ex. 52 at 2822–23.)

Moreover, even if Petitioner had an expert at trial to question the Prosecution experts' interpretation of the fingerprint evidence, it is unlikely that the additional testimony would have altered the jury's verdict. *See Hicks v. Head,* 333 F.3d 1280, 1287 (11th Cir.2003) (explaining that even if there is an error under *Ake,* it is subject to a harmless error analysis and a state court decision should not be overturned unless the error had a " 'substantial and injurious effect' on the guilty verdict or the death sentence"). The fingerprint evidence was not the only evidence that placed Petitioner at the various crime scenes. In fact, Petitioner confessed to his presence at the crime scenes during the time of the rapes and murders and he confessed to burglarizing the residences (with the exception of the Jackson residence, which he could not remember). Therefore, according to Petitioner's own confession, he was at the crime scenes and could have left his fingerprints.

For these reasons, this Court finds that the state court's decision denying funds for a fingerprint expert was not contrary to, or an unreasonable application of, federal law. Additionally, Petitioner has not shown that the state court's decision was "based on an unreasonable determination of facts in light of the evidence." 28 U.S.C. § 2254(d)(2). Accordingly, Petitioner is not entitled to habeas relief on this ground.

### b. Hair and Fiber Expert

■ Petitioner maintains that he was denied his right under *Ake* to the assistance of a hair and fiber expert. It does appear that Petitioner made timely pretrial requests for expert examination of any hair evidence in the case. (Resp't Ex. 1 at 42, 260.) Petitioner also renewed his motion for funds for a hair and fiber analyst at trial. (Resp't Ex. 57 at 3880.)

At trial, the Prosecution presented evidence from Benny Blankenship, a microanalyst employed with the Georgia State Crime Lab. (Resp't Ex. 57 at 3863.) Mr. Blankenship testified that he analyzed foreign hairs found at the Jackson, Dimenstein, Scheible, Thurmond, Woodruff, Borom, and Cofer crime scenes. (Resp't Ex. 57 at 3863–64.) He testified that the "foreign hairs were determined … to be Negroid in type." (Resp't Ex. 57 at 3864.) Mr. Blankenship testified that when comparing Petitioner's hair to the hairs found at the crime scenes, he determined "there was insufficient similarities shown to me to conclude that they could have a common origin." (Resp't Ex. 57 at 3866.) Mr. Blankenship testified that this did not exclude the Defendant as the donor of the hair; it was simply inconclusive. (Resp't Ex. 57 at 3866.)

Myron Scholberg also testified for the Prosecution. He too compared foreign hairs from the crime scenes with hairs from Petitioner. (Resp't Ex. 57 at 3883.) Mr. Scholberg testified that he "could reach no conclusion as to whether or not these hairs could have originated from this particular individual. However, the differences in my opinion were not sufficient to eliminate this individual as a possible source of these hairs." (Resp't Ex. 57 at 3883.) On cross-examination, Mr. Scholberg again stated that he could not determine whether the hairs from the crime

scenes came from Petitioner. (Resp't Ex. 57 at 3885–86.)

At the state habeas corpus hearing, Petitioner submitted the affidavit of James L. Small as an example of the evidence he could have presented had the trial court granted his requests for funds to hire a hair and fiber expert. In his affidavit, Mr. Small states that "[f]rom my examination of Mr. Blankenship's testimony, I can unequivocally state that the hair evidence in no way, shape or form connects Carlton Gary to the crimes for which he stands convicted." (Resp't Ex. 190.) Mr. Small does not say that the hair evidence excludes Petitioner.

The state habeas court ruled against Petitioner. The state court applied the "clearly established Federal Law"—*Ake*. 28 U.S.C. § 2254(d)(1). Therefore, the state court decision was not "contrary to" Supreme Court precedent. Moreover, the proffered testimony of Mr. Small did nothing more than reiterate the inconclusive testimony of both Mr. Blankenship and Mr. Scholberg, both of whom testified that they could reach no conclusion regarding whether the hairs found at the scenes came from Petitioner. At most, Mr. Small's testimony was merely cumulative. *See Conklin,* 366 F.3d at 1210 (explaining that when proposed testimony is cumulative, the denial of funds for the proposed expert does not render the trial fundamentally unfair). Based on the foregoing, this Court concludes that the state habeas court's decision was not "an unreasonable application of ... established Federal law." 28 U.S.C. § 2254(d). Therefore, Petitioner is not entitled to relief on this issue.

### c. Hypnosis Expert

■ In Claim Twenty–Six of his amended state habeas corpus petition, Petitioner claimed that "[t]he use of unreliable hypnosis evidence against [Petitioner] denied him the effective assistance of counsel, a fair trial and due process of the law in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." (Resp't Ex. 129 at 159.) Specifically, Petitioner complained that, at the trial level, he was denied the necessary funds to hire a hypnosis expert. (Resp't Ex. 129 at 159.) The state habeas court found that this claim was "waived because Petitioner did not raise [it] on direct appeal and ... utterly failed to make any showing of cause of prejudice." (Resp't Ex. 135 at 3.)

Petitioner raised the same claims in Ground Twelve of his federal habeas petition. Based on the state habeas corpus court's ruling, this Court held that Petitioner procedurally defaulted his claims regarding the improper use of hypnosis. (Doc. 77 at 10–11.) To the extent Petitioner's claim that he should have been given funds to hire a hypnosis expert is not procedurally defaulted, this Court finds that Petitioner has not shown that the state habeas court's holding regarding the denial of funds for such an expert was "contrary to, or ... an unreasonable application of, established Federal law." Additionally, Petitioner has not maintained that the state court's decision was based on an unreasonable determination of the facts." [18]

A review of the record shows that a medical doctor at the University of Georgia Medical School, Dr. Wiggins, attempted to hypnotize Mrs. Miller on October 31, 1977.[19] (Resp't Ex. 52 at 2829.) Dr. Wig-

---

**18.** This Court recognizes that in Claim Seventeen of his amended state habeas corpus petition, Petitioner complained about the lack of funds for a hypnosis expert. (Resp't Ex. 129 at 107.) The state habeas court ruled on this issue. (Resp't Ex. 161.) Therefore, this Court will address the issue regarding the lack of funds for a hypnosis expert "on the merits."

**19.** It is unclear from the record whether the actual date that Dr. Wiggins attempted to

gins died before Petitioner's trial. (Resp't Ex. 52 at 2829.) After reviewing an audio tape of the attempted hypnosis, neither the Prosecution, nor the Defense, knew whether Mrs. Miller was under hypnosis.

Following Georgia law at the time, the Prosecution was prohibited from introducing statements made by Mrs. Miller while under hypnosis. *See Walraven v. State,* 255 Ga. 276, 282, 336 S.E.2d 798 (1985)(holding that "the testimony of a previously hypnotized witness will not be considered corrupt and inadmissible. . . . That testimony will simply be considered frozen, for the purposes of the party subjecting the witness to hypnosis, as of the date of the hypnosis"). Therefore, the Prosecution assumed that Mrs. Miller was under hypnosis during the session with Dr. Wiggins and did not present any hypnosis experts any evidence obtained from Mrs. Miller during the hypnosis session.

Conversely, Petitioner was allowed to assume that Mrs. Miller was **not** under hypnosis at the October, 1977 session and he impeached much of Mrs. Miller's testimony by using the statements she made during the hypnosis session. (Resp't Ex. 53 at 3009–17.) Petitioner also was the party to raise the issue of hypnosis during trial. Petitioner asked Mrs. Miller on cross-examination if "there [had] been any attempts made to hypnotize [her], to get [her] to recall [her] testimony." (Resp't Ex. 53 at 3017.) She responded that she remembered without hypnosis. (Resp't Ex. 53 at 3017.)

The state habeas court applied *Ake* to these facts. As the state court applied the existing Supreme Court precedent, its decision is not "contrary to . . . established Federal law." 28 U.S.C. § 2254(d)(1). Moreover, given these facts, Petitioner has not shown that the state habeas court's

decision involved an unreasonable application of federal law.

The case that Petitioner cites in support of his position that he should have been given funds for a hypnosis expert, *Little v. Armontrout,* 835 F.2d 1240 (8th Cir.1987), does not alter this Court's decision. In that case, "the State called its own expert on hypnosis to testify at the suppression hearing." *Id.* at 1245. The Eighth Circuit Court of Appeals held that the trial court should not have denied the defense "a similar weapon." *Id.* Such was not the case here because the Prosecution did not offer a hypnosis expert, and did not even use any information obtained from Mrs. Miller during hypnosis. Under these circumstances, the state habeas court reasonably concluded that the trial court's denial of funds did not render Petitioner's trial fundamentally unfair.

### d. Forensic Odontologist

▇ Petitioner maintains that he was denied his right under *Ake* to the assistance of a forensic odontologist. It does appear that prior to his trial Petitioner made a timely request for expert examination of any "tooth impressions or molds . . . procured pursuant to the investigation of these cases." (Resp't Ex. 1 at 42.)

At trial, the Prosecution called Dr. Joe Webber. Dr. Webber, a medical examiner for the State of Georgia, testified that during his autopsy of Janet Cofer he observed "what appeared to be tooth marks" on Mrs. Cofer's left breast and he consulted "odontology experts." (Resp't Ex. 54 at 3217.) Following this testimony, Petitioner's trial counsel renewed his request for funds for a forensic odontologist. (Resp't Ex. 54 at 3234.) The Prosecution explained that it "didn't have any compari-

hypnotize Mrs. Miller was October 31, 1977 or October 29, 1977, as both dates appear in

the record.

sons to make." (Resp't Ex. 54 at 3234.) Furthermore, the Prosecution stated that Petitioner had dental repair work done between the time the murder was committed and the time of his arrest. Therefore, any comparisons would be invalid. (Resp't Ex. 54 at 3235.) The trial court, in light of this information, denied Petitioner's motion for funds and explained that it did not believe the teeth impressions were a "critical piece of evidence in the case." (Resp't Ex. 54 at 3234.)

At the state habeas corpus level, Petitioner first learned that a cast had been made of the bite mark on Mrs. Cofer's breast. This cast has never been located. The state habeas corpus court held that trial judges' denial of funds did not render Petitioner's trial fundamentally unfair and did not violate his due process rights. (Resp't Ex. 161 at 6.)

The Eleventh Circuit Court of Appeals has explained that, "[i]n determining the reasonableness of the trial court's refusal to provide independent expert assistance, we consider only the facts available to the trial judge when he made a ruling on the particular motion." *Conklin,* 366 F.3d at 1208. At the time the judge denied Petitioner's motion for a forensic odontologist, he knew only that there was a bite mark on Mrs. Cofer's left breast. The bite mark was in no way linked to Petitioner. The judge was told that even if Petitioner was afforded a forensic odontologist, there was nothing that the expert could compare as Petitioner had dental work between the time of Mrs. Cofer's murder and his arrest. In light of this, the trial judge concluded that a forensic odontologist would not be helpful and Petitioner could receive a fair trial without such an expert. This ruling was upheld by the state habeas court. Petitioner has not shown that this ruling involved "an unreasonable application of" *Ake.*

e. Serological Expert

Petitioner maintains that he was denied his right under *Ake* to the assistance of a serological expert. Petitioner contends that the deferential standard of review under § 2254(d) does not apply to this claim "because the state courts never had the opportunity to rule upon the evidence which was presented in this Court at the evidentiary hearing on November 21, 2002, including the newly discovered work papers and the testimony of Mr. Morrison explaining the work papers."[20] (Doc. 96 at 24.) Respondent disagrees and maintains that the state court ruled against Petitioner on this *Ake* claim, and the newly discovered worksheets add nothing to this Court's analysis.

Petitioner cites several cases to support his theory that the Court should review this issue *de novo.* However, all of the cases he cites stand for the proposition that AEDPA's deference requirement does not apply to a *Brady* claim when the undisclosed evidence first surfaces at the federal level. *See Killian v. Poole,* 282 F.3d 1204 (9th Cir.2002); *Monroe v. Angelone,* 323 F.3d 286 (4th Cir.2003); *Rojem v. Gibson,* 245 F.3d 1130 (10th Cir.2001); *Williams v. Coyle,* 260 F.3d 684 (6th Cir. 2001). None of these cases address the specific issue that is presented here: Does AEDPA's deference requirement apply when the state court did rule on a petitioner's *Ake* claim, but the petitioner discovered additional evidence to arguably support his claim while the case was pending in the federal district court?

---

**20.** The background involving the serological evidence presented at trial, the discovery of additional serological evidence during the pendency of Petitioner's action in this court, and the testimony presented at the November 21, 2000 evidentiary hearing are detailed below in section "5 F" of this Order.

■ Notwithstanding the absence of any precedent precisely on point, the Court finds that it should review this claim *de novo.* The state court never had the opportunity to review the GBI worksheets or to hear, based on the information contained in the worksheets, the evidence that Petitioner could have presented at trial, but for the lack of funds. *See Conklin,* 366 F.3d at 1209 (explaining that in making a determination if the lack of funds rendered a petitioner's trial fundamentally unfair, the court reviews "example[s] of evidence [the Petitioner] could have presented had the trial court granted his requests for assistance"). Therefore, this Court reviews *de novo* Petitioner's claim that he was denied his right under *Ake* to the assistance of a serological expert.

In *Conklin,* the Eleventh Circuit explained as follows:

> Assuming, *arguendo,* that *Ake* extends to non-psychiatric experts, then we must determine (1) whether [Petitioner] made a timely request to the trial court for the provision of expert assistance; (2) whether it was "reasonable" for the trial court to deny [Petitioner's] request; and (3) whether the denial rendered [Petitioner's] trial fundamentally unfair.... With respect to the third *Moore [v. Kemp,* 809 F.2d 702, 712 (11th Cir.1987)(*en banc* ) ] requirement, we ask whether the *Ake* error "had substantial and injurious effect or influence in determining the jury's verdict."

*Conklin,* 366 F.3d at 1206 (quoting *Moore,* 809 F.2d at 710 and *Hicks v. Head,* 333 F.3d 1280, 1286 (11th Cir.2003)).

■ Using this analysis, the Court examines Petitioner's claim regarding the denial of funds for a serological expert. Petitioner made timely requests for a serological expert. He requested such an expert pre-trial and renewed his request during trial. (Resp't Ex. 1 at 42, 260; Resp't Ex. 55 at 3499–3502, 3504, 3508–09, 3544.) The trial court denied Petitioner's motions for funds. Therefore, the next inquiry is "whether it was 'reasonable' for the trial court to deny [Petitioner's] request." *Conklin,* 366 F.3d at 1207. In *Conklin,* the Eleventh Circuit explained as follows:

> In determining the reasonableness of the trial court's refusal to provide independent expert assistance, we consider only the facts available to the trial judge when he made a ruling on the particular motion.... The reasonableness of a judge's denial "necessarily turns on the sufficiency of the petitioner's explanation as to why he needed an expert." ... Thus, we ask whether the trial judge should "have concluded that unless he granted his request Petitioner would likely be denied an adequate opportunity fairly to confront the State's case and to present his defense."

*Id.* at 1208 (quoting *Moore,* 809 F.2d at 710–13).

In his pre-trial motion, Petitioner explained that he expected "critical evidence will be introduced at his trial which will involve blood and fluid analysis." (Resp't Ex. 1 at 260.) Citing *Ake,* Petitioner requested the appointment of an expert in this area. (Resp't Ex. 1 at 260–263.) Petitioner never spoke to the State's serological expert prior to trial. (Resp't Ex. 55 at 3524.) Therefore, it was apparent during trial that he did not know what tests the expert had conducted on the blood and semen. For example, Petitioner requested funds to employ Dr. Grunbaum and/or a professor from Emory, both of whom would testify to the inherent unreliability of electrophoresis testing of blood or seminal fluid. (Resp't Ex. 55 at 3500.) However, the State's experts were "not able to utilize the electrophoretic systems." (Resp't Ex. 44 at 3522.) Therefore, Peti-

tioner's proposed experts' testimony on the reliability of such testing would be completely irrelevant. Accordingly, the trial judge's denial of these two proposed experts was reasonable.

Petitioner also argued at the trial level that he simply could not cross-examine Mr. Wegel about his findings as he did not understand the details of the absorption elution and absorption inhibition studies performed by Mr. Wegel. (Resp't Ex. 55 at 3537–38.) Petitioner stated that he needed his own expert to assist him. As authority for this request, Petitioner cited *Ake* and *Thornton v. State*, 255 Ga. 434, 339 S.E.2d 240 (1986). In *Thornton*, the Georgia Supreme Court held that when a defendant timely requests funds for an expert to interpret critical evidence that "is likely to be the subject of varying expert opinions," a reasonable amount of funds should be granted. *Thornton*, 255 Ga. at 435, 339 S.E.2d 240. "Having been placed on notice of this authority" and given Petitioner's repeated requests for a serological expert, this Court finds that the trial court was unreasonable in denying his request.[21] *Conklin*, 366 F.3d at 1208–09.

The final issue is whether the trial court's denial of funds "rendered [Petitioner's] trial fundamentally unfair." *Conklin*, 366 F.3d at 1206. Petitioner must show that the "alleged *Ake* error had a "substantial and injurious effect or influence in determining the jury's verdict." " *Id.* At trial, the State's expert, Mr. Wegel, testified that the seminal fluid taken from Mrs. Jackson, Mrs. Scheible, and Mrs. Thurmond came from a non-secretor or a weak O secretor. (Resp't Ex. 55 at 3564–67, 3569–70.) On cross-examination, Mr. Wegel admitted that tests of the Petitioner showed him to be a type O secretor and if the semen samples came from a non-secretor, Petitioner would be excluded as the perpetrator. (Resp't Ex. 55 at 3575–76, 3579.) However, if the semen samples came from a weak O secretor, Petitioner could not be excluded as the donor of the fluid. (Resp't Ex. 55 at 3565–68, 3575–76, 3582.)

Mr. Wegel also testified that Petitioner could not be eliminated as the perpetrator of the rape of Mrs. Borom. (Resp't Ex. 55 at 3572.) The vaginal swabs taken from Mrs. Borom were positive for seminal fluid and spermatozoa and showed the presence of international blood groups A and O. (Resp't Ex. 55 at 3572.) Mrs. Borom had type A blood and was a secretor, while Petitioner had type O blood and was a secretor. (Resp't Ex. 55 at 3572.)

Another of the State's experts, Linda Tillman, testified in relation to the testing of fluids from Kathleen Woodruff. She testified that Mrs. Woodruff was a type B secretor and B antigen was present in her vaginal cavity as well as H-reactive substance, which indicated bodily fluids from a type O secretor. (Resp't Ex. 55 at 3572, 3585–86.) Therefore, Petitioner could not be excluded as the donor of this fluid.

At the November 21, 2000 evidentiary hearing held in this Court, Petitioner presented evidence that he could have presented at the original trial had the trial court provided the funds. His expert, after reviewing all of the available worksheets and reports, opined that se-

---

**21.** In *Moore v. Kemp*, 809 F.2d 702 (11th Cir.1987) and *Stephens v. Kemp*, 846 F.2d 642 (11th Cir.1988) the Eleventh Circuit set forth additional requirements for the specificity of a request for expert assistance. However, Petitioner's trial occurred before these cases were decided. Therefore, this Court did not consider whether the trial court's denial of funds was reasonable in light of these cases. *See Conklin*, 366 F.3d at 1208–09 (explaining that the additional requirements in *Moore* and *Stephens* should not be considered in determining a trial court's reasonableness in denying funds if the trial occurred before those cases were decided).

cretor/non-secretor testing should not have been conducted on the Jackson and Scheible samples. (Doc. 47 at 79–88.) In relation to the fluid from Mrs. Thurmond, Petitioner's expert explained that, in his opinion, the donor of the semen was a non-secretor. (Doc. 47 at 93–94.) Petitioner's expert offered no explanation of the findings in the Borom and Woodruff cases.

As can be seen, the semen evidence presented at trial did not conclusively establish that Petitioner was the perpetrator; nor did it necessarily exclude him either. This testimony has always been inconclusive. If Petitioner had the funds, he could have possibly presented the expert opinion that the semen on Mrs. Thurmond was from a non-secretor and, therefore, could not be from Petitioner.

Notwithstanding these "possibilities," the Court finds it unlikely that this would have altered the outcome of the trial. Petitioner's expert explained that the amount of secretions vary over time. (Resp't Ex. 55 at 3568, 3577.) Thus, the level of secretions left at the crime scenes in 1977–78, may not correspond with the secretions shown in the testing of Petitioner's saliva in 1984. Furthermore, Petitioner's expert did not testify that Petitioner could be excluded as the donor of the fluids in any of the other cases. In addition, there was other evidence to establish Petitioner as the perpetrator of these crimes. His fingerprints were at the various scenes. He admitted he was present at the crime scenes, including the residence of Mrs. Thurmond. Evidence showed that, just as Petitioner did in the past in New York and South Carolina, he tried to blame the actual rapes and murders on someone else. However, there was no evidence implicating anyone except him. Moreover, Mrs. Miller identified Petitioner as the man who raped her. Two other witnesses identified Petitioner as being in the area at the time of the crimes. (Resp't Ex. 50 at 2607;

Resp't Ex. 51 at 2628–39.) In light of the this evidence, and the fact that Petitioner already established at trial that the serological evidence was inconclusive, this Court finds that Petitioner fails to satisfy the third requirement in *Conklin*—that the denial of funds rendered Petitioner's trial fundamentally unfair. *Conklin*, 366 F.3d at 1206.

5. *Alleged Failure to Disclose Exculpatory Evidence*

Petitioner maintains in Ground Nine that the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, by failing to disclose the following: (1) police reports in which Gertrude Miller makes inconsistent statements; (2) a police report relating to Doris Laufenberg's identification of Petitioner; (3) police reports relating to other suspects; (4) a police report that mentions a bite mark cast made from Janet Cofer's left breast; (5) police reports showing Petitioner's alleged physical inability to commit the crimes for which he was convicted; and (6) Georgia Bureau of Investigation ("GBI") worksheets relating to serological evidence.

During his state habeas corpus hearing, Petitioner argued that the Prosecution violated *Brady* by failing "to turn over several allegedly inconsistent statements by Gertrude Miller, various police reports about other suspects, police reports about Petitioner, an alleged tape recording of a statement by Petitioner and additional police reports about physical evidence." (Resp't Ex. 161 at 4.) The state habeas corpus court held lengthy hearings regarding the alleged *Brady* violations. (Resp't Ex. 143–151.) The trial judge who presided over the case and the district attorneys who prosecuted the case testified at these hearings on the issue of suppression of

allegedly material, exculpatory evidence. (Resp't Ex. 142–146.)

In its opinion, the state habeas corpus court cited the existing federal law contained in *Brady, U.S. v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The court held as follows:

> After an independent review of the documents by the Petitioner and the documents reviewed by Judge Followill prior to trial, this court finds that the mandates of *Brady* were complied with by both the State and trial judge in this case. First, this court notes that most of the documents listed by the Petitioner were included in the file which was sent to Judge Followill for review, and he found only two additional documents which needed to be turned over to the defense under *Brady*. This court agrees. Additionally, none of the documents which Petitioner now points to are exculpatory and they do not fall within the purview of *Brady*. Furthermore, the combined effect of these documents does not undermine confidence in the verdict, and there is no reasonable probability that the result of the trial would have been different if these documents were given to the defense at trial.

(Resp't Ex. 161 at 4–5.)

The Court reviews each of Petitioner's *Brady* claims below. All of these claims, with the exception of the claims involving the GBI serological worksheets, are reviewed under the standards set forth in § 2254(d).

 The "clearly established Federal law, as determined by the Supreme Court of the United States" on this issue, is found in *Brady, Bagley*, and *Kyles*. To-

gether, these cases hold that to establish a *Brady* violation, the Petitioner must show that (1) the Prosecution possessed the evidence and failed to disclose it to the defense (irrespective of the good or bad faith of the Prosecution); (2) the defense did not possess the evidence and could not reasonably obtain it; (3) the evidence was favorable to the defense (either exculpatory or impeaching); and (4) the evidence was material, i.e., if it had been disclosed to the defense a reasonable probability exists that the outcome of the proceeding would have been different. " 'A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Kelley v. Secretary for the Dep't of Corr.*, 377 F.3d 1317 (11th Cir.2004)(quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375). Finally, the determination regarding whether due process has been violated is made by considering the cumulative effect of all of the suppressed evidence favorable to the defense. *See Bagley*, 473 U.S. at 675, 105 S.Ct. 3375.

a. Gertrude Miller's Identification of Petitioner

Regarding the identification by Mrs. Miller, Petitioner maintains that the Prosecution violated *Brady* by failing to turn over the following documents:

(1) A September 11, 1977 police interview of the individual who found Mrs. Miller after the attack. Upon finding Mrs. Miller, Elizabeth Bell asked her if the person who attacked her was black or white and Mrs. Miller responded, "I don't know what it was." (Resp't Ex. 147 at 726.) [22]

(2) A September 11, 1977 police interview with Mrs. Miller in which she indi-

---

**22.** The record shows that the statement of Elizabeth Bell was not left with the court reporter. The Court cannot locate an actual copy of this statement in the voluminous rec-

ord. Therefore, the Court will use the information provided by the parties as evidence of what the statement contained.

cated she was only raped vaginally and that "she would not be able to identify the subject and she was not able to describe him." (Resp't Ex. 147 at 549.)

(3) An October 17, 1977 interview with Mrs. Miller in which police showed her five photos with Jerome Livas' picture included and she stated that Mr. Livas "was the closes [sic] to the suspect in the case but was unable to be positive about the identification, although she stated that he had the right features. She stated that she might be able to be positive with an identification if she saw the suspect in person." (Resp't Ex. 147 at 727.)

(4) An October 31, 1977 police interview with Mrs. Miller in which it indicated the perpetrator is 5'10" tall. (Resp't Ex. 147 at 729.)

(5) A January 17, 1978 interview with Mrs. Miller in which she attempted to give police information to enable them to draw a composite drawing of her attacker. She described her attacker as "a black male, in his early 20's, approximately 5'8" to 5'10", medium complexion, very slender, no facial hair, wearing a black shirt with a flowered design on the front." Mrs. Miller explained that the resulting sketch was "very accurate" and "very similar to the perpetrator." (Resp't Ex. 147 at 543–46.)

(6) A January 18, 1978 interview with Mrs. Miller in which the police and an artist attempt to draw a composite sketch of her attacker. According to the report, "Mrs. Miller rated the finished product highly and stated that it was the closest sketch she had observed since the date of her attack." (Resp't Ex. 147 at 730–34.)

(7) A July 13, 1978 interview with Mrs. Miller in which she was shown a drawing of an individual. Mrs. Miller indicated "that the drawing was a very good likeness of the individual that raped her. She remarked that the sharp chin and long forehead and smooth brown complexion were definite features of the individual who raped her." She did say that she would add skin wrinkles to the throat and that her attacker was "around 6' tall." (Resp't Ex. 147 at 547–48.)

(8) A May 29, 1984 interview with Mrs. Miller. Petitioner states that it was in this interview that Mrs. Miller first mentioned her attacker "placing something around her neck and that she believed [it] to be a stocking." Petitioner also maintains that "for the first time, this report indicates that M[r]s. Miller never believed the first composite drawing was accurate, and that the second one was closer but not exact." (Resp't Ex. 147 at 723–25.)

(9) A March 6, 1985 interview with Mrs. Miller in which she again stated that she identified Petitioner after seeing him on television. (Resp't Ex. 147 at 720–22.)

The state habeas court reviewed these documents and listened to testimony regarding each. Applying the "established Federal law" in *Brady, Bagley,* and *Kyles,* it determined there had been no *Brady* violation. As the state court applied the correct Supreme Court precedent, its decision was not "contrary to" federal law. "A state court's decision that applies the law as determined by the Supreme Court to the facts is not 'contrary to' whether or not the federal court would have reached a different result." *Carr,* 364 F.3d at 1250 (quoting *Fugate,* 261 F.3d at 1216).

■ Petitioner maintains that the state court's decision was an unreasonable application of the clearly established federal law. It is uncontested that the documents in question were in the possession of the State and were not turned over to the Defense. Furthermore, Petitioner maintains that this evidence is favorable to him

because he could have used this evidence to "undermine or at least raise serious doubts about the reliability of Ms. Miller's in-court identification of Mr. Gary." (Doc. 96 at 102.)

Respondent maintains that the composite drawings are not favorable to the defense simply because they arguably do not favor Petitioner at the time of the trial. The composites were drawn in 1978. The trial occurred in 1986. Mrs. Miller specifically stated that Petitioner did not look the same at the time of trial as he did at the time of the attack. (Resp't Ex. 53 at 3009.) Furthermore, Respondent maintains that none of the documents are "material" as Petitioner brought out "[n]umerous inconsistencies, discrepancies, lapses of memory and changes in description" during cross-examination of Mrs. Miller. (Doc. 101 at 90.) Therefore, even if the police interviews and composites show further inconsistencies, they are cumulative at best.

Using the deferential standard of review established in § 2254(d), this Court must uphold the decision of the state habeas court. Even if some of the documents could be seen as favorable to the defense, they would be cumulative of the inconsistencies in Mrs. Miller's identification, which inconsistencies Petitioner already established during trial.

During his cross-examination of Mrs. Miller, Petitioner established the following: Mrs. Miller had "such a hard time getting faces all together" since she was hit on the head in the attack; she gave inconsistent statements regarding whether the attacker tied her up; she gave inconsistent statements regarding whether the attacker tried to choke her; she gave inconsistent statements about the clothing worn by the attacker; she gave inconsistent statements regarding the board her attacker used to hit her; and she gave inconsistent statements regarding her attacker's age. Peti-

tioner further established that Mrs. Miller identified Petitioner as her attacker after seeing him on TV with a group of police officers leading him down a hallway. (Resp't Ex. 53 at 3009–18.)

Given the fact that Petitioner was already able to impeach Mrs. Miller's testimony with previous inconsistent statements, the Court finds that additional previous inconsistent statements of the same nature would be merely cumulative, and there is no reasonable probability that the outcome of the proceedings would have been any different had the evidence been disclosed to the defense. Therefore, the state court's decision on this issue was not an unreasonable application of *Brady, Bagley*, or *Kyles. See Baxter v. Thomas*, 45 F.3d 1501, 1506–07 (11th Cir.1995) (explaining that failure to disclose a transcript of inconsistent statements does not violate *Brady* when Petitioner was already able to impeach witnesses with inconsistent statements on cross-examination); *Nelson v. Nagle*, 995 F.2d 1549 (11th Cir.1993).

b. Doris Laufenburg's Identification of Petitioner

In its August 21, 2002 Order, this Court held that Petitioner's claim regarding Doris Laufenberg's identification of Petitioner was procedurally defaulted. (Doc. 77 at 15–16.) Therefore, the Court will not address Petitioner's claims on this issue.

c. Documents Relating to Chris Gingell, Wade Hinson, and Jesse Rawlings

Petitioner contends that Chris Gingell, Wade Hinson, and Jesse Rawlings were suspects in the rapes and murders for which he was convicted. Petitioner complains that police reports that show them as suspects should have been turned over to the Defense. The state habeas court

applied *Brady, Bagley,* and *Kyles* and ruled against Petitioner on this issue. As the state court applied the correct Supreme Court precedent, its decision is not "contrary to ... established Federal law." 28 U.S.C. § 2254(d)(1). Petitioner maintains that the state court's decision involved an "unreasonable application" of *Brady,* and its progeny.

Petitioner alleges that Mr. Gingell was a suspect in the burglary of Emily Woodruff, which occurred February 4, 1977, and the burglary of Ruth Schwob, which occurred between February 4 and February 7, 1978.[23] Petitioner argues that the State never disclosed documents showing that Mr. Gingell was a suspect in these two burglaries. (Resp't Ex. 147 at 521–42, 662–71.) Petitioner maintains that with these documents, "trial counsel could have established that Gingell was a prime suspect in two burglaries that occurred at the height of the stocking stranglings at a time when police considered every burglary in the Wynnton areas to be the work of the strangler." (Doc. 96 at 118.)

Respondent maintains, as the Prosecutors did at the state habeas corpus hearing, that these documents were not turned over because they were not exculpatory. Respondent explains that the documents did not relate to a specific crime attributed to Petitioner, and Mr. Gingell was eliminated as a suspect.

■ Petitioner has not shown that the state court's decision was an unreasonable application of federal law. The record shows that Petitioner knew Mr. Gingell was a suspect in the burglaries and murders that occurred in the Wynnton area. Petitioner told police officers that he thought Mr. Gingell had been charged with the murders. (Reps't Ex. 54 at 3348–51.) As Petitioner had personal knowledge that Mr. Gingell was a suspect, it was not a

violation of *Brady* for the Prosecution to fail to reveal documents regarding Mr. Gingell's status as a suspect. *See United States v. Valera,* 845 F.2d 923, 927–28 (11th Cir.1988).

Additionally, documents from the state habeas corpus hearing show that Gingell was eliminated as a suspect in the rapes and murders. A crime lab report that was turned over to Petitioner prior to trial shows that Mr. Gingell was a secretor who belonged to International Blood Group B, whereas the perpetrator of the crime belonged to International Blood Group O. (Resp't Ex. 150 at 1287–91.) As the blood type excluded Mr. Gingell, "there is [not] a reasonable probability that, had the [documents involving the investigation of Mr. Gingell] been disclosed to the defense, the result of the proceedings would have been different." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (*quoting Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

Similarly, Wade Hinson and Jesse Rawlings were ultimately eliminated as suspects because no physical evidence (fingerprints, hair, semen) could tie them to the rape and murders. At the state habeas corpus hearing, the Prosecutor explained that although Mr. Hinson fit the profile of being a blood type O secretor, so did forty percent of the general population. Therefore, this alone would not be exculpatory evidence for Petitioner. This is especially true in light of the fact that Mr. Hinson did not match any other physical evidence found at the scenes of the crimes. (Resp't Ex. 145 at 266.) The same is true for Mr. Rawlings. Although his blood type was O, no other physical evidence could tie him to the crimes. Therefore, he was eliminated as a suspect.

After lengthy hearings, the state habeas corpus court ruled against Petitioner on

---

**23.** This was prior to the February 11, 1978 attack on Mrs. Schwob.

the issue of whether Prosecutors violated *Brady* by failing to deliver the police reports detailing investigatory work regarding Mr. Gingell, Mr. Hinson, and Mr. Rawlings. Both of the Prosecutors from Petitioner's trial testified at the state habeas court evidentiary hearings. Thus, the state habeas court was in a position to determine the credibility of the Prosecutors. This Court must defer to such credibility determinations. *Baldwin,* 152 F.3d at 1317. Under the deferential standard in § 2254(d), Petitioner has not shown that the state court's ruling was "an unreasonable application of" Supreme Court precedent.

### d. Bite Mark Evidence from Janet Cofer

■ Prior to trial, Petitioner was provided with a copy of the autopsy report of Mrs. Cofer, which showed that she had a bite mark on her left breast. (Resp't Ex. 145 at 283.) As explained above in section 4D, at Petitioner's trial, Dr. Joe Weber testified that there were tooth marks on Janet Cofer's left breast. (Resp't Ex. 54 at 3217.) Dr. Weber testified that "we consulted some odontology experts." (Resp't Ex. 54 at 3217.) At this point, Petitioner's trial attorney objected to Dr. Weber testifying regarding what any odontology expert said. (Resp't Ex. 54 at 3217.) The Prosecutors in no way linked the bite mark on Mrs. Cofer's breast with

Petitioner. The Prosecutors did not disclose to Petitioner a police report dated July 6, 1984. (Resp't Ex. 150 at 661.) This report shows that two detectives went to the office of Dr. C.W. Galbreath and "secured a mold of the teeth impression taken from a bite mark on the left breast of Janet Cofer." (Resp't Ex. 150 at 661.) The detectives then met with Prosecutors and "traveled to Atlanta, Georgia to the office of D.D.S. Thomas J. David." (Resp't Ex. 150 at 661.) According to the report, Dr. David "stated that he would have to have a mold of the teeth of [Petitioner] . . . [and] he would attempt to match the teeth but it was a possibility that he would not be able to say for sure whether or not the bite was made by [Petitioner]." (Resp't Ex. 150 at 661.) Petitioner maintains that the Prosecution's failure to turn over this report violates *Brady.*[24]

At the state habeas corpus hearing, the Prosecutor explained that the report was not disclosed to the defense because "the evidence had shown that [Petitioner] had extensive dental work done." (Resp't Ex. 145 at 281.) Specifically, a police report introduced into evidence at the state habeas corpus hearing shows that detectives visited Dr. Hahn, a dentist at the Kirkland Correctional Institute in Columbia, South Carolina. (Resp't Ex. 150 at 1316–17.) Dr. Hahn explained that in October 28, 1983, he made an impression of Petition-

---

**24.** Petitioner does not argue that failure to turn over the mold of the bite mark itself violates *Brady.* Presumably this is because the mold has never been found and no one knows if it is actually exculpatory. In order to establish a due process violation from the State's failure to preserve evidence that is only possibly exculpatory, Petitioner would have to show that the government officials acted in bad faith; that the evidence is material in showing Petitioner's innocence; and that there is no alternate means of showing Petitioner's innocence. See *United States v. Brown,* 9 F.3d 907 (11th Cir.1993). This

Court previously denied Petitioner's request for an evidentiary hearing regarding the State's conduct in preventing Petitioner access to the bite mark evidence. At this time, the Court refuses to reconsider this issue and DENIES Petitioner's Motion to Reconsider Order Denying Evidentiary Hearing Regarding Bite Mark Evidence. It is the Court's understanding that Petitioner is now arguing that the State's failure to disclose the police report that mentions the bite mark cast violated *Brady.* It is this issue that the Court now considers.

er's teeth. (Resp't Ex. 150 at 1316.) However, he had already disposed of that impression. Dr. Hahn also explained that on November 17, 1983, he placed a crown on one of Petitioner's top upper teeth and that another upper front tooth was false and could be removed by Petitioner. At the state habeas corpus evidentiary hearings, the Prosecutor testified that after the State learned this information, "we made a decision not to seek an order to make an impression of his teeth to have compared." (Resp't Ex. 145 at 282.) Thus, the July 6, 1986 police report containing this information was not deemed material. After hearing all of the testimony, the state habeas court, applying the applicable Supreme Court precedent of *Brady, Bagley*, and *Kyles*, ruled against Petitioner. In order to prevail at this level, Petitioner would have to show that the state court's decision involved an unreasonable application of this precedent or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).

Petitioner argues that the state habeas court's decision involved an objectively unreasonable application of federal law. He maintains that the July 6, 1984 police report is material and should have been disclosed for three reasons. First, Petitioner claims that the report "belies the assertions made by the State at trial. It shows that there had been attempts made at comparing the bite mark found on Ms. Cofer and other suspects." (Doc. 96 at 131.) The Court is unsure to what Petitioner is referring. This report does not mention any comparisons involving "other suspects."

Petitioner also maintains that the report is material because it "establishes that the bite mark evidence was 'critical' and that its 'nature' was 'subject to varying professional opinion.'" (Doc. 96 at 131.) This report merely shows that a mold of the bite mark on Mrs. Cofer's breast was made and that a mold of Petitioner's mouth would have to be made in order to compare the two. Furthermore, the report shows that Dr. David maintained that any comparison may be inconclusive.

Finally, Petitioner maintains that the report is material because "it would have put defense counsel on notice that a cast for comparison existed and would have prompted a line of investigation that could have led to exculpatory evidence." (*Doc.* 96 at 131.)

Petitioner points to the affidavits from Dr. Hahn and Dr. David that he introduced at the state habeas corpus level to show that, had the defense known of the bite mark cast earlier, exculpatory evidence was available. (Doc. 117, Ex. 4 and 5.) In his affidavit, Dr. David states that he remembers the mold from the bite mark showed "crowding" in the lower teeth and that he firmly believed that the "impression that [he] was shown might have led to a positive identification of the person who inflicted the wound." (Doc. 117, Ex. 4.) Furthermore, Dr. Hahn verified that the dental work he performed on Petitioner was "limited to [Petitioner's] two front upper teeth." (Doc. 117, Ex. 5.) Thus, if Petitioner ever had "crowding" in the lower teeth, Dr. Hahn did not correct this "crowding" and the dental work done by Dr. Hahn would have no impact on matching Petitioner's teeth to those of the mold from Janet Cofer's breast.

In response, Respondent maintains that Petitioner has always known there was a bite mark on Mrs. Cofer's breast and Petitioner "had access to his own dental records and could have established, using these records, that Petitioner's teeth marks would not have matched the bite marks." (Doc. 101 at 119.) Respondent states that "Petitioner's dental records and

his teeth were 'evidence' in his own possession, to utilize in his own behalf as a defense, and the lack of knowledge of a plaster cast having been made of the bite mark by the Prosecution does not transform this evidence into 'material' evidence for *Brady* purposes." (Doc. 101 at 120.)

Moreover, this Court notes that Petitioner's trial counsel did not cross-examine Dr. Weber at all regarding the bite mark on Mrs. Cofer's breast. Had he done so, it is likely he could have discovered information about the visit with the odontologist and the bite mark cast. In fact, Dr. Weber started to testify about the consultation with the odontologist before Petitioner's attorney stopped him.

The state habeas court found no *Brady* violation. This Court must accord deference to the state court's decision and to the credibility determinations it made during the evidentiary hearing. *Baldwin*, 152 F.3d at 1317. The Court does not decide if it "would have reached the same result as the state court if [it] had been deciding the issue in the first instance." *Wright*, 278 F.3d at 1256. Under this deferential standard, the Court finds that Petitioner has not shown that the state court's decision was objectively unreasonable. Therefore, this Court finds federal habeas corpus relief unavailable on this issue.

e. Physical Inability to Commit the Crimes

 Petitioner maintains that "[t]he District Attorney had in his files at least three documents which shed considerable doubt on whether Petitioner was physically able to commit the crimes the State attributed to him." (Doc. 96 at 134.) Petitioner maintains, as he did at the state habeas corpus level, that the Prosecutors violated *Brady* by failing to disclose three police reports.

First, Petitioner points to a police report dated February 7, 1985. That report shows that Petitioner escaped from the Jamesville Correctional Institute in Syracuse, New York, on August 22, 1977. Moreover, the report shows that on August 26, 1977 an informant called the police in New York to report that Petitioner was at the residence of a girlfriend, whom he had assaulted. The informant also stated that Petitioner was "limping badly and believed to have a broken leg." (Resp't Ex. 147 at 648–49.)

Second, Petitioner argues that the State should have disclosed a police report showing an August 2, 1984 interview with Earnestine Flowers. The report shows that Ms. Flowers met with Petitioner "sometime in 1977" and he was wearing "a cast on one of his ankles." She reported that the cast had a heel on it for walking and Petitioner "seemed to get around real well" and was not using a cane or crutch. (Resp't Ex. 147 at 650.) Petitioner fails to point out that a signed statement given by Mrs. Flowers and attached to the August 2, 1984 police report contains the following colloquy:

Q: Did you ever ask [Petitioner] what had happened to his foot?

A: He told me that he had injured his foot while playing ball or something and that it was very minor. He told me that he took the cast off himself because I saw him a couple of days later and [the] cast was off. He got around real good with the cast on[.][H]e didn't have a cane, crutches or anything.

(Resp't. Ex. 146 at 654–55.)

Third, Petitioner contends that a police report dated September 2, 1984 should have been disclosed. This report shows that at some time prior to summer 1977, Dollie Crittenden saw Petitioner in Columbus, Georgia, and observed that he "had something wrong with his foot." (Resp't Ex. 147 at 657.) Mrs. Crittenden stated that Petitioner said a snake had bitten his

foot and "it was swollen real bad and . . . it appeared that the foot was broken." (Resp't Ex. 147 at 657.)

Petitioner argues that these documents are relevant because they show that he did not have the agility and mobility to commit the crimes in question. Moreover, none of the footprints taken around the crime scenes pointed to a perpetrator with an injured foot.

The state habeas court held that the State had not violated *Brady* by failing to disclose these police reports. This Court finds that this decision is not contrary to, or an unreasonable application of, well established federal law. One of the elements of a *Brady* claim is that the Petitioner "does not possess the evidence nor could he obtain it himself with any reasonable diligence." *Baxter*, 45 F.3d at 1506. If Petitioner had a broken foot or a foot that had been bitten by a snake, he certainly would know this himself and he would not need the State to tell him of such.

Furthermore, it does not appear that the three reports were even favorable to Petitioner. The police report dated February 2, 1985 shows that Petitioner, although limping, was able to assault his girlfriend. (Resp't Ex. 147 at 648–49.) The police report detailing an August 2, 1984 interview with Ernestine Flowers shows that any injury Petitioner had was minor and he was able to move around very well. Mrs. Flowers even explained that Petitioner could remove the cast from his foot at will. (Resp't Ex. 147 at 650.) Finally, Dollie Crittendon did state that Petitioner's foot was swollen. However, she also stated that she would see him "walk to the store to use the phone" and then walk back home. (Resp't Ex. 147 at 658.)

Additionally, it appears that at trial the Prosecution introduced evidence of Petitioner's injury. The State sought to establish the time frame in which Petitioner returned to Columbus, Georgia in the summer of 1977 by using testimony regarding Petitioner's foot injury. (Resp't Ex. 57 at 3823.) The State presented Louis Racona, who escaped from Jamesville Correctional Institute with Petitioner. Mr. Racona testified that Petitioner injured his foot in the jump and he could not run, only walk. (Resp't Ex. 57 at 3823–24.) Ernestine Flowers testified that when Petitioner came to her mother's house in Columbus, Georgia in 1977, he had a cast on his foot. (Resp't Ex. 58 at 4064.) Finally, Dollie Crittendon testified that Petitioner was living in Columbus, Georgia in the summer of 1977 and had an injury to his foot at the time. (Resp't Ex. 57 at 3825–46.) Thus, the State has never tried to hide any alleged foot injury. Petitioner could have cross-examined any of these witnesses, or called any witnesses of his own, if he wished to establish that the nature of his foot injury was such to prevent him from committing the crimes with which he was charged.

The state habeas court reasonably applied *Brady, Kyles,* and *Bagley* in rejecting this claim. Therefore, this Court cannot grant habeas relief on this issue.

### f. The Secretor/Non–Secretor Issue

Petitioner maintains that the State violated *Brady* by failing to turn over GBI worksheets of serological examinations. These worksheets were not turned over until after Petitioner filed his federal habeas corpus petition.

The background involving the GBI worksheets is as follows: In late 1977, John Wegel, a forensic serologist, tested semen samples from the Mary "Fern" Jackson, Florence Scheible, Martha Thurmond, and Mildred Borom crime scenes. Regarding Mrs. Jackson, Mrs. Scheible, and Mrs. Thurmond, Mr. Wegel prepared official reports which stated that "serologi-

cal examination ... suggests the presence of H-reactive substance suggesting the donor to be a weak secretor of international blood group O or a non-secretor." (Doc. 46, Exs. 4, 6, 8.)

Linda Tillman, also a forensic serologist, tested a semen sample from the Kathleen Woodruff crime scene. (Resp't Ex. 55 at 3585–86.) Ms. Tillman testified that Mrs. Woodruff was a type B secretor and B antigen was present in her vaginal cavity as well as H reactive substance, which indicates bodily fluids from a type O secretor. (Resp't Ex. 55 at 3585–86.)

Following Petitioner's arrest, Connie C. Pickens, a forensic serologist, tested Petitioner's blood and saliva and determined that he was a type O secretor. (Resp't Ex. 55 at 3548–49.) She testified at trial regarding Petitioner's blood type and secretor status. (Resp't Ex. 55 at 3548–49.)

Petitioner's trial counsel was aware of Mr. Wegel's and Ms. Pickens's official reports. During Petitioner's trial, his trial counsel cross-examined the forensic serologists regarding the findings contained in their reports. (Resp't Ex. 55 at 3573–81.) Specifically, in relation to Mrs. Jackson, Mrs. Scheible, and Mrs. Thurmond, Mr. Wegel testified that examination of the seminal fluid showed the presence of H-reactive substance and he interpreted the fluids as being from a person who was a non-secretor or a weak O secretor. (Resp't Ex. 55 at 3564–67.) Regarding Mrs. Borom, Mr. Wegel testified that the vaginal swabs were positive for seminal fluid and spermatozoa, which showed the presence of A antigen and H-reactive substance. (Resp't Ex. 55 at 3572.) Mr. Wegel testified that the fluid, therefore, showed the presence of international blood groups A and O. (Resp't Ex. 55 at 3572.) Mrs. Borom was a secretor of type A blood and Petitioner is a secretor of type O blood. (Resp't Ex. 55 at 3572.)

Mr. Wegal also testified that if the semen samples from these various victims came from a non-secretor then Petitioner would be excluded as he is a type O secretor. (Resp't Ex. 55 at 3575–76, 3579.) However, if the semen samples came from a weak type O secretor, Petitioner could not be excluded as the donor of the various semen samples as he was a type O secretor. (Resp't Ex. 3565–68, 3575–76, 3582.) Explaining why Petitioner could not be excluded even though he was a type O secretor and not a non-secretor or weak type O secretor, Mr. Wegel explained that a person may secrete more in one bodily fluid than in another. Therefore, Petitioner may secrete more in his saliva (which was tested in 1984) than in his semen. (Resp't Ex. 55 at 3568, 3582.) Mr. Wegel also explained that people may vary in the amount of their secretions over a period of time. (Resp't Ex. 55 at 3567, 3577.)

Although Petitioner was always aware of the forensic serologists' official reports, Mr. Wegel's worksheets regarding the Jackson case were not turned over to Petitioner until February 24, 2000 as a result of an Open Records Act request to the GBI Crime Lab. (Doc. 46, Stip.¶ 3.) Based on another Open Records Act request to the GBI Crime Lab, the worksheets in the Scheible and Thurmond cases were turned over on August 28, 2000. (Doc. 46, Stip. ¶ 5.) Finally, the worksheets regarding the 1984 testing of Petitioner's blood and saliva were turned over on November 17, 2000. (Doc. 46, Stip.¶ 5.)

Petitioner maintains that the Prosecution's failure to turn over these worksheets violates *Brady*. Additionally, Petitioner argues that the review standards established by AEDPA do not apply to this *Brady* claim because the state courts never had the opportunity to rule upon the evidence as it was not discovered until after Petitioner filed his federal habeas

corpus petition. To support his position that AEDPA's deference does not apply when a claim is premised on *Brady* material that first surfaces during federal proceedings, Petitioner cites *Killian v. Poole*, 282 F.3d 1204 (9th Cir.2002); *Monroe v. Angelone*, 323 F.3d 286 (4th Cir.2003); *Rojem v. Gibson*, 245 F.3d 1130 (10th Cir. 2001); and *Williams v. Coyle*, 260 F.3d 684 (6th Cir.2001). In contrast, Respondent maintains that the deferential review established in AEDPA applies because Petitioner, in the state courts, raised various *Brady* claims.

 It is true that, at the state level, Petitioner set forth various *Brady* claims. However, the state courts could not have considered the GBI worksheets when ruling on these various claims because the worksheets surfaced first during the federal habeas proceedings. Consequently, this Court finds that the deferential review of § 2254(d) does not apply to this particular *Brady* claim. *See Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir.2003)(holding that "AEDPA's deference requirement does not apply when a claim made on federal habeas review is premised on *Brady* material that has surfaced for the first time during federal proceedings"). Accordingly, the Court reviews *de novo* Petitioner's claim that failure to turn over Mr. Wegel's worksheets from the serological examinations violates *Brady*.

 Petitioner has always had possession of the GBI's official reports relating to the semen found at the various crime scenes. However, the worksheets related to the testing of the semen were not turned over to Petitioner until after the commencement of this federal habeas corpus action. The fact that the worksheets were in the GBI's possession, as opposed to that of the Prosecutor, is no excuse for the Prosecution's failure to turn over evidence to the defense. *Kyles*, 514 U.S. at 419, 115 S.Ct. 1555.

Petitioner must establish, however, that the worksheets are favorable to the defense. *Moon v. Head*, 285 F.3d 1301 (11th Cir.2002). The only information contained in these worksheets not present in the official reports is the actual results of the absorption inhibition tests and the absorption elution tests.[25] Petitioner maintains that the worksheets are favorable because they show that the absorption inhibition test indicated the donor was a non-secretor (thereby excluding the Petitioner as the person who left these samples). (Doc. 96 at 41–42.) Furthermore, Petitioner contends the worksheets show that the only contrary reactions were on the highly sensitive absorption-elution tests, which tests, according to Petitioner, are not reliable.

Respondent disagrees and asserts that "the turning over of the worksheets ... adds nothing of significance to the record before the Court nor does it contribute to this Court's resolution of any issues properly before the Court for adjudication." (Doc. 101 at 44.) Respondent's expert, John Wegel, testified at the evidentiary hearing that his review of the worksheets did not alter the opinions contained in the official reports and did not alter the opinions he gave at trial. (Doc. at 47, at 132, 146, 149, 151, 160–61.) According to Mr. Wegel, these reports, just like the official reports that Petitioner has had since trial, do not exclude Petitioner as the donor of the semen. (Doc. 47 at 160.)

Even assuming that the worksheets of the serological examinations are favorable

---

**25.** The absorption inhibition and the absorption elution tests are both used to identify the ABO type and secretor status of an individual or a stain of bodily fluids. In 1977, the GBI Crime Lab always performed both tests simultaneously on a stain. (Doc. 47 at 142–43.) Petitioner's trial counsel knew that both of these tests were performed on the fluids in question. However, he did not know the actual results of the tests.

to the Petitioner, the Court finds that the worksheets are not material because there is not " 'a reasonable probability that, had the [worksheets] been disclosed to the defense, the result of the proceeding would have been different.' " *Mincey v. Head*, 206 F.3d 1106, 1135 (11th Cir.2000) (citations omitted).

During Petitioner's trial in 1986, his trial counsel cross-examined Mr. Wegel regarding the findings in his official reports. (Resp't Ex. 55 at 3373–81.) Mr. Wegel admitted that his reports were inconclusive. His findings did not conclusively establish Petitioner as the perpetrator; nor did they conclusively exclude Petitioner. (Resp't Ex. 55 at 3565, 3567–68, 3575–76, 3582.) Nothing in the worksheets that Wegel prepared made him change his opinions in this regard. (Doc. 47 at 132, 146, 149, 151, 160–61.)

Based on evidence presented at the federal evidentiary hearing, it appears that possession of the Jackson, Scheible, and Thurmond worksheets may have allowed Petitioner to offer an expert who would have argued that the individual results on the absorption inhibition tests for Mrs. Thurmond point to the perpetrator being a non-secretor. (Doc. 47 at 94.) However, even the Prosecution's own expert at trial stated that the donor of the semen could be a non-secretor and, if so, Petitioner would be excluded as the perpetrator. Therefore, the Court finds that Petitioner

has not shown there is "a reasonable probability that, had the [worksheets] been disclosed to the defense, the result of the proceeding would have been different." *Mincey*, 206 F.3d at 1135. Petitioner has not shown that the worksheets "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555.

Petitioner makes the related argument that the "testimony given by Mr. Wegel at Petitioner's trial was knowingly false, or substantially misleading, violating the Petitioner's due process rights, under *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)." (Doc. 96 at 39.) However, the worksheets that Petitioner received in February and August 2000 (which Wegel prepared) do not show that Mr. Wegel's testimony was so false or misleading, "that the Prosecution knew or should have known that the testimony was false, and that the perjured testimony was material." *Jacobs v. Singletary*, 952 F.2d 1282, 1286–87 (11th Cir.1992). At most, all that Petitioner has shown is that a second expert may disagree with Mr. Wegel's opinions and conclusions. This alone does not prove that Mr. Wegel's testimony was false or misleading; and it certainly does not prove the Prosecution knew, or should have known, of its falsity. Therefore, Petitioner is not entitled to federal habeas corpus relief on this ground.[26]

---

**26.** Petitioner again argues that his semen should be tested now, almost eighteen years after his trial and twenty-seven years after the testing of the stains in the Jackson, Scheible, and Thurmond cases. This Court has already denied such a request in its Order dated June 29, 2001 and it refuses to reconsider its decision. (Doc. 56.) Contrary to Petitioner's contentions, he has not shown, nor would a current test of his semen conclusively show, "actual innocence" as that term is defined by the Supreme Court in *Herrera v. Collins*, 506

U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). As the Court explained in *Herrera*, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400, 113 S.Ct. 853. There has been no independent constitutional violation in this case. Moreover, as the Court explained in its June 29, 2001 Order, this is not a case in which Mr. Wegel's serological work-

### 6. Alleged Unreliability of Identifications

In Ground Eleven, Petitioner contends that he "was denied a fair trial when unreliable in-court identifications of [him] were made in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." (Doc. 10 at 69.) Specifically, Petitioner states that "[a]t trial, Gertrude Miller, Sue Nelson and Doris Laufenberg all testified that they had seen Petitioner at the time of the crimes and made in-court identifications of him. The identifications were the result of impermissibly suggestive identification techniques employed by the State." (Doc. 10 at 69.)

In its Order dated August 21, 2002, this Court found that Petitioner's claims relating to the identifications made by Sue Nelson and Doris Laufenberg were procedurally defaulted. (Doc. 77 at 15–16.)

Regarding the identification made by Gertrude Miller, the Georgia Supreme Court held as follows:

> The only surviving victim of the defendant's strangulation attacks testified at trial and identified him as her assailant. The defendant was not entitled to a hearing outside the presence of the jury to determine the admissibility of the testimony of this witness. *Watkins v. Sowders,* 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981), and her testimony was admitted in evidence properly. *Pruitt v. State,* 258 Ga. 583, 373 S.E.2d 192 (1988).

*Gary,* 260 Ga. at 42, 389 S.E.2d 218.

▆▆ Petitioner maintains that because "the Supreme Court of Georgia simply ruled that Ms. Miller's testimony 'was ad-

mitted in evidence properly,' … § 2254 does not apply and the Petitioner is entitled to a *de novo* review." (Pet'r May 20, 2003 Br., Doc. 96 at 191.) However, the Eleventh Circuit has explained that a "state court's summary, which is to say unexplicated, rejection of the federal constitutional issue qualifies as an adjudication under § 2254(d) so that it is entitled to deference." *Wright,* 278 F.3d at 1254. "[S]parse or otherwise unsatisfactory state court discussion is not grounds for failing to grant deference under § 2254(d)(1)." *Id.* at 1254, n. 2. As the issue of Ms. Miller's identification was "raised in and decided by" the Georgia Supreme Court, § 2254(d) applies.

The clearly established federal law in this area is found in three cases: *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); and *Watkins v. Sowders,* 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981).

In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court held that the central issue to be decided regarding witness identification is whether, under the totality of circumstances, the identification was reliable even though the confrontation procedure was suggestive. Moreover, factors to consider when determining the likelihood of misidentification include the following:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty dem-

---

sheets prove Petitioner is factually innocent. At most, they can be used by Petitioner to show that experts would disagree on the conclusions reached by Mr. Wegel. Moreover, a semen test performed today would not establish Petitioner's factual innocence. It would

only confirm what has been known all along-Petitioner is a type O secretor. This, however, would not eliminate Petitioner as the perpetrator of the crimes for which he was convicted.

onstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Id.* at 199–200, 93 S.Ct. 375.

Similarly, in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) the Supreme Court held that "[t]he admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Id.* at 106, 97 S.Ct. 2243 (citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Id.* at 114, 97 S.Ct. 2243. The Court explained that the factors to be considered were those mentioned in *Biggers*. *Manson*, 432 U.S. at 114, 97 S.Ct. 2243. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id.*

Finally, in *Watkins v. Sowders*, 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981), the United States Supreme Court cited *Manson* for the proposition that "[i]t is the reliability of identification evidence that primarily determines its admissibility." *Id.* at 347, 101 S.Ct. 654. Additionally, the Court held that the Due Process Clause of the Fourteenth Amendment does not require a hearing out of the presence of the jury to determine the admissibility of identification testimony. *Id.* at 349, 101 S.Ct. 654.

■ Although the state court refused to conduct a hearing outside the jury's presence regarding Mrs. Miller's testimony, no hearing was required by *Watkins*. Petitioner's trial counsel was given the opportunity to cross examine Mrs. Miller regarding her testimony. (Resp't Ex. 53 at 3009–21.) As the Supreme Court explained in *Watkins*, "under our adversary system of justice, cross examination has always been considered a most effective way to ascertain truth." *Watkins*, 449 U.S. at 349, 101 S.Ct. 654.

■ The Georgia Supreme Court's decision in this case likewise was not contrary to or an unreasonable application of *Biggers* and *Manson*. Under the holdings in both of those cases, even if the police used an impermissibly suggestive procedure to obtain identification, that identification is still admissible if it is reliable. In this case, it does not appear the police used a suggestive and unnecessary identification procedure. Mrs. Miller made a spontaneous identification of Petitioner when she saw him on television in police custody. On direct examination Mrs. Miller testified as follows:

Q. Would you tell us the circumstances of your seeing him on TV?

A. Well, I couldn't have—people had asked me, well, who was it? And I said, well, I don't know, it's somebody I never had seen before. And then the thing is that later on, on TV, well, when I saw him, I said, oh, that's the man. I was sitting with some—the family. And I had already moved from that house over to be with my brother in the regular family house of ours, and I said, that's the man, that's the man, that's the man.

. . .

Q. All right, After doing this or sometime after seeing him on television and pointing him out to your family members, as you have described, did you call the police yourself?

A. I think my brother did.

Q. For you?

A. Uh-huh. (positive response).

Q. But you contacted the police before they came to you, is that right?

A. Yes.

(Resp't Ex. 53 at 3006–07.)

Similarly, on cross examination, Mrs. Miller testified as follows:

Q. Okay. And it's true, isn't it, that in the television broadcast, where you saw him, they identified him as being the person that was arrested for these crimes?

A. No. When I saw him on television for the first time, it was with a group, and I was sitting inside and I said, that's the man, that's the man.

. . .

Q. Yes, ma'am. And in the group of people that you saw him in, it was group of police officers leading him down a hallway, wasn't it?

A. Yes.

. . .

Q. Yes, ma'am. He was waking down a hallway and the television camera was right in front of him, wasn't it?

A. Yes.

(Resp't Ex. 53 at 3009–10.)

Even if this identification was the result of an impermissibly suggestive procedure, it had sufficient reliability and therefore was not contrary to, or an unreasonable application, of *Biggers* or *Manson*." [27] *Manson*, 432 U.S. at 106, 97 S.Ct. 2243. Specifically, Mrs. Miller testified that she had plenty of opportunity to view Petitioner at the time of the crime. In fact, the light was on during the rape and she saw Petitioner from both a side and frontal view. (Resp't Ex. 53 at 3004, 3008.) Mrs. Miller testified there was no doubt in her mind that Petitioner was the person who attacked her. (Resp't Ex. 53 at 3008–09.) Moreover, although seven years passed between the rape and the identification, Mrs. Miller saw hundreds or thousands of photographs of potential perpetrators between the time of the rape and her identification

of Petitioner, and she never identified anyone else as her attacker. (Resp't Ex. 53 at 3008.)

To support his position that Mrs. Miller's identification should have been excluded, Petitioner points to a police interview in which Mrs. Miller said that she could not identify her attacker. However, the notes from this same interview, which was conducted at the hospital immediately following her rape, specifically showed that Mrs. Miller was "in a 'stupor' at this time" and that "[s]he might be able to provide more details after she recovers some." (Resp't Ex. 147 at 549.)

The Court finds that given these facts, the Georgia Supreme Court's decision that Mrs. Miller's testimony was properly admitted into evidence was not contrary to, or an unreasonable application of, federal law. Additionally, Petitioner has not maintained or shown that the decision involved an unreasonable determination of the facts in light of the evidence. As such, Petitioner is not entitled to relief under § 2254(d).

### 7. *Other Crime Evidence*

Petitioner maintains in Ground Fourteen that the State improperly introduced evidence of crimes he allegedly committed other than those for which he was indicted and tried. Specifically, Petitioner argues that evidence relating to other rapes and murders in the Columbus, Georgia area should not have been introduced; nor should evidence relating to the rape of Jean Frost from Syracuse, New York.

On direct appeal, the Georgia Supreme Court rejected Petitioner's claim that the

---

**27.** Insofar as Petitioner claims that Mrs. Miller's in-court identification of Petitioner was not reliable because it was "hypnotically refreshed testimony," such claim is procedurally defaulted. Petitioner's claims relating to the use of hypnosis to refresh a witness's memory were found to be procedurally defaulted by the state habeas court (Resp't Ex. 135 at 3)and by this Court in its August 21, 2002 Order. (Doc. 77 at 31.) Therefore, this Court will not review this claim in this Order.

other crime evidence was improperly admitted: "[E]xtrinsic transactions demonstrating the defendant's *modus operandi* were admitted in evidence. In view of the relevant similarities between the extrinsic transactions and the crimes on trial, the court did not err by allowing their admission in evidence. *Hamilton v. State*, 255 Ga. 468, 471, 339 S.E.2d 707 (1986)." *Gary*, 260 Ga. at 42, 389 S.E.2d 218.

■ Contrary to Petitioner's assertions, § 2254(d) does apply and the Petitioner is not entitled to a *de novo* review of this claim. The Georgia Supreme Court's ruling that the other crimes evidence was properly admitted at trial was a ruling on the merits. Therefore, it is entitled to deference under § 2254. The fact that the Georgia Supreme Court did not give a lengthy explanation of its ruling or cite a case from the United States Supreme Court does not change the deference that this Court must give to the state court's decision. *See Early*, 537 U.S. at 8, 123 S.Ct. 362; *Wright*, 278 F.3d at 1253–54.

Petitioner has not cited a United States Supreme Court case that constitutes "clearly established Federal law." The Eleventh Circuit has explained that " 'where no Supreme Court precedent is on point, we cannot say that the state court's conclusion . . . is contrary to clearly established Federal law as determined by the U.S. Supreme Court.' " *Henderson*, 353 F.3d at 890 (quoting *Isaacs v. Head*, 300 F.3d 1232, 1252 (11th Cir.2002)).

Petitioner merely maintains that this Court should conduct a *de novo* review and find the other crimes evidence was erroneously admitted at Petitioner's trial. Since it is apparent that the trial court and the Georgia Supreme Court found that these other crimes were sufficiently similar to the crimes for which Petitioner was charged to warrant their admission into evidence, AEDPA standards require that a "habeas petitioner can overcome a state court's 'presumption of correctness' on factual determinations only by coming forth with 'clear and convincing evidence.' " *Hightower*, 365 F.3d at 1014. Petitioner has failed to carry his burden of rebutting by clear and convincing evidence the state courts' conclusions that the crimes were sufficiently similar to be admitted into evidence.

■ The Court further observes that its review of evidentiary rulings is limited "to determin[ing] whether the error was of such magnitude as to deny fundamental fairness to the criminal trial." *Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir. 1995). Petitioner has failed to show that the admission of the other crimes evidence "was of such a magnitude to deny fundamental fairness." *Id.* For these reasons, Petitioner is not entitled to habeas relief on this claim.

### 8. *State Court's Denial of Petitioner's Recusal Motions*

■ Petitioner claims in Ground Seventeen that "[t]he trial court's refusal to grant Petitioner's motions to recuse Judge Followill violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." (Doc. 10 at 84.) Petitioner alleges that prior to trial, he filed a Motion to Recuse Judge Followill. In the motion, he contended that Judge Followill "was racially prejudiced and was not fit to preside over the Petitioner's trial." (Doc. 96 at 195.) Judge C. Cloud Morgan of the Macon Judicial Circuit conducted a hearing on the motion on July 21, 1986. Judge Followill appeared at this hearing and was represented by counsel. Petitioner maintains that he therefore "became a party litigant against the Petitioner prior to the Petitioner's trial [and this] required that Judge Followill be disqualified as the trial judge in the Petitioner's case." (Doc. 96 at 195.)

Addressing this issue, the Georgia Supreme Court held as follows:

Before trial, the defendant moved to recuse Judge Followill on the ground that his ruling on the motion for change of venue showed he was guilty of racial prejudice. Judge Morgan presided over the hearing on the motion to recuse, and properly denied the motion. *United States v. Meester*, 762 F.2d 867, 884–85 (11th Cir.1985). The defendant now contends Judge Followill should have been recused because he was a party litigant represented by counsel at the hearing on the motion to recuse. This contention was not raised until more than a year after the hearing and is not timely. *Romine v. State*, 251 Ga. 208, 305 S.E.2d 93 (1983). *Compare Isaacs v. State*, 257 Ga. 126, 355 S.E.2d 644 (1987).

*Gary*, 260 Ga. at 41–42, 389 S.E.2d 218.

■ At the time of Petitioner's trial, Georgia law provided that if a party files a timely motion to recuse a trial judge, the trial judge's duty is limited to passing upon the sufficiency of the affidavit. *State v. Fleming*, 245 Ga. 700, 267 S.E.2d 207 (1980). Moreover, when the motion to recuse is referred to another judge, Georgia law held that "[a]t such hearing, all interested parties shall be entitled to representation by either an appointed or retained counsel." *Id.* at 703, 267 S.E.2d 207. Judge Followill's legal representation at the recusal hearing therefore was entirely appropriate under Georgia law. Furthermore, this Court must defer to the state law requirements regarding the timeliness of Petitioner's motion for recusal. As the Eleventh Circuit explained in *Carrizales v. Wainwright*, 699 F.2d 1053 (11th Cir.1983), "[q]uestions of pure state law do not raise issues of constitutional dimension for federal habeas corpus purposes." *Id.* at 1054–55.

This Court finds that Petitioner has not shown that the Georgia Supreme Court's recusal decision was contrary to, or an unreasonable application of, Supreme Court precedent. The case relied upon by Petitioner, *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), is distinguishable from the facts of the present case. Since material differences exist between this case and *Ward*, the Georgia Supreme Court's decision in this case was not contrary to *Ward*. *See Ramdass v. Angelone*, 530 U.S. 156, 167, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000)(explaining that when material differences exist between cases, the state court's decision in the case pending review is not contrary to the rule announced in the previous case from the United States Supreme Court).

In *Ward*, the mayor of Monroeville, Ohio, while acting as judge, convicted Ward of two traffic offenses and fined him $50.00 for each. The mayor was responsible for village finances and the mayor's court provided a substantial sum to the village through its fines. Ward complained that he had been denied a trial before a fair and impartial judge as guaranteed by the Due Process Clause of the Fourteenth Amendment. *Ward*, 409 U.S. at 57–58, 93 S.Ct. 80. The Court held as follows:

[T]he test is whether the mayor's situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused...." Plainly that "possible temptation" may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court.

*Id.* at 60, 93 S.Ct. 80 (quoting *Tumey v. Ohio,* 273 U.S. 510, 534, 47 S.Ct. 437, 71 L.Ed. 749 (1927)).

The fact that Judge Followill was represented at the recusal hearing by counsel (as was allowed under state law pursuant to *Fleming* ) does not establish that he was a biased judicial officer and does not make him a party to the underlying case. Moreover, the fact that he was the subject of Petitioner's recusal motion does not remove his impartiality. Petitioner has simply failed to establish that the state court's decision regarding recusal of the trial judge was "contrary to, or an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d). Therefore, Petitioner is not entitled to habeas relief on this ground.

### 9. *Alleged Ineffective Assistance of Counsel on Appeal*

Petitioner claims in Ground Twenty–One that his appellate counsel, Frank Derrickson and Bud Siemon, were ineffective for two reasons: "First the conflict of interest that existed during remand proceedings continued on direct appeal.... Second, the briefs filed on the Petitioner's behalf were inadequate and did not effectively and competently raise all meritorious issues in the Petitioner's case or contain competent argument for those issues raised by appellate counsel." (Doc. 96 at 208.)

This Court previously found that no conflict of interest existed for Petitioner's counsel during the remand proceedings. (Doc. 77 at 23–26.) In its August 21, 2002 Order, this Court found that the state habeas court's determination that Derrickson did not suffer from a conflict of interest was not contrary to, or an unreasonable application of, federal law, specifically, *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The Court refused to reconsider its decision on this issue in its Order dated October 28, 2002.

(Doc. 78.) Likewise, the Court finds reconsideration of this issue now unwarranted. Since there was no conflict of interest during the remand proceedings, there could be no "continuation" of a "conflict" on appeal.

Regarding Petitioner's claim that the briefs submitted by attorneys Derrickson and Siemon were inadequate, Petitioner states:

> With respect to the ineffective assistance of counsel under *Strickland [v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)], based upon a review of the briefs submitted by Mr. Siemon and Mr. Derrickson, it is obvious that the issues were not thoroughly raised or thoroughly argued. The Petitioner was prejudiced in that, had all claims been raised and competently argued, the result of the Petitioner's direct appeal would have been different.

(Doc. 96 at 210.)

In his state habeas petition, Petitioner did allege "[c]ounsel rendered ineffective assistance on direct appeal when he unreasonably and prejudicially failed to raise meritorious issues on appeal and on extraordinary motion for new trial." (Resp't Ex. 129 at 81.) The Court cannot locate, and neither party has pointed to, a location in the record in which the state habeas court addressed this particular issue. Therefore, the Court addresses this issue *de novo. See Wright,* 278 F.3d at 1253–54 (explaining that if the state court does not rule on the merits of a claim, the federal courts must review the claim without any § 2254 deference).

The standard announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) applies to Petitioner's claim that his appellate counsel was ineffective. *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). This standard is as follows:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial [or appeal in this case], a trial [or appeal] whose result is reliable.

*Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

█ However, appellate counsel does not have a duty to raise every non-frivolous issue on appeal. *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). In fact, "[a] brief that raises every colorable issue runs the risk of burying good arguments—those that, in the words of the great advocate John W. Davis, 'go for the jugular,' ...—in a verbal mound made up of strong and weak contentions." *Id.* at 753, 103 S.Ct. 3308. Finally, in relation to both appellate and trial counsel, the attorney's performance is entitled to highly deferential judicial scrutiny. *Fugate v. Head,* 261 F.3d 1206, 1216 (11th Cir.2001).

With these standards in mind, the Court has reviewed the briefs submitted by attorneys Siemon and Derrickson. In his twenty-nine page brief dated December 23, 1986, Mr. Siemon set forth and explained eighteen enumerations of error. (Resp't Ex. 65.) Following the remand hearing, Mr. Siemon submitted an additional brief addressing that hearing. (Resp't Ex. 80.) Additionally, on July 10, 1989, Mr. Derrickson submitted a brief containing six enumerations of error. (Resp't Ex. 81.)

█ Both Mr. Siemon and Mr. Derrickson are experienced criminal defense attorneys. (Resp't Ex. 146 at 455–90.) The presumption in favor of effective assistance of counsel is strong when counsel is experienced. *Fugate,* 261 F.3d at 1216. Petitioner has not shown that his appellate attorneys were deficient. He has failed to demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Therefore, Petitioner is not entitled to habeas relief on this claim.

10. *Alleged Ineffectiveness of Counsel on Remand for Determination of Effectiveness of Trial Counsel*

a. Conflict of Interest and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In Ground Twenty-two, Petitioner contends that he received ineffective assistance of counsel from Frank Derrickson during his remand hearing for the determination of effectiveness of trial counsel. Petitioner's argument is twofold: First, Petitioner maintains that Mr. Derrickson provided ineffective assistance of counsel at the remand hearing because he was suffering from a conflict of interest; and second, Petitioner contends that Mr. Derrickson was ineffective based on the standards in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The state habeas court ruled against Petitioner on both of these issues. In rejecting the conflict of interest argument, the state habeas court relied on *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and held that Petitioner failed to show that Mr. Derrickson actively represented conflicting interests. (Resp't Ex. 161.) In relation to Petition-

er's claim of ineffective assistance under *Strickland,* the state habeas court held that Mr. Derrickson provided effective representation. (Resp't Ex. 161 at 8–9.)

As Petitioner concedes, this Court, in its Order of August 21, 2002 (reconsideration of which was denied in its Order of October 28, 2002), has previously held that the state habeas corpus court's conclusions regarding Mr. Derrickson's representation were not contrary to, and did not involve an unreasonable application of, either *Cuyler* or *Strickland* and, therefore, cannot be set aside on federal habeas corpus review.[28] Petitioner now maintains that "this Court was mistaken in reaching those conclusions and asks that the Court revisit these issues." (Doc. 96 at 149.) For the reasons discussed at length in both this Court's August 21, 2002 Order and its October 28, 2002 Order, this Court refuses to revisit these issues and refuses to disturb the state habeas corpus court's ruling that Petitioner's remand counsel provided him with constitutionally effective assistance of counsel. (Docs. 77 and 78.)

Just as he did at his state habeas corpus hearing, Petitioner "attempts to assert ineffectiveness of his remand counsel by relitigating the issue of effectiveness of his trial counsel, Mr. Siemon." (Resp't Ex. 161 at 9.) However, the following courts have all found that Petitioner waived/procedurally defaulted his claim that trial counsel was constitutionally ineffective: (1) the trial court following remand from the Georgia Supreme Court (Resp't Ex. 68);

(2) the Georgia Supreme Court (*Gary,* 260 Ga. at 40, 389 S.E.2d 218); (3) the state habeas court (Resp't Ex. 135 at 2); and this Court (Docs. 77 and 78). This Court has thoroughly reviewed Petitioner's claims regarding the ineffectiveness of both his trial and remand counsel and refuses to reconsider its decisions regarding either of these issues. (Docs. 77 and 78.) For reasons discussed in this Court's previous Orders, Petitioner is not entitled to habeas relief on ground twenty-two of his petition.

b. Secretor/Non–Secretor Evidence

Petitioner maintains that based on the worksheets of the serological examinations that the GBI turned over in February and August 2002, this Court must decide *de novo* the constitutional effectiveness of trial counsel and remand counsel. As this Court has previously made clear, Petitioner procedurally defaulted any claim that his trial counsel was ineffective. Due to that procedural default, Petitioner cannot litigate the issue. The Court rejects Petitioner's repeated attempts to find a way to litigate an issue which he has defaulted.

Petitioner attempts to avoid this procedural default by asserting that this Court, in light of the newly discovered serological worksheets, must decide *de novo* the issue of his remand counsel's effectiveness, "which by necessity requires consideration of the constitutional effectiveness of trial and sentencing counsel." (Doc. 96 at 68.)

---

**28.** Specifically, in prior briefs that addressed the issue of procedural default, Petitioner argued that remand counsel Derrickson failed to provide him with effective, conflict-free representation during the remand hearing and this ineffectiveness should serve as cause to excuse the procedural default of his ineffective of trial counsel claim. Due to this assertion, the Court requested that both parties address the issue of whether Mr. Derrickson provided effective representation at the re-

mand hearing. (Doc. 65.) Both parties submitted briefs on this issue. (Docs. 70, 73, 76.) After reviewing all of the briefs, this Court determined that the state habeas court's decision that Mr. Derrickson provided effective and conflict-free representation was not contrary to, and did not involve an unreasonable application of, *Cuyler* and *Sullivan.* (Doc. 77 at 22–27.) The Court refused to reconsider its claim in an Order dated October 28, 2002. (Doc. 78.)

Petitioner then argues that his trial counsel was ineffective.

Preliminarily, this Court does not find that the serological worksheets materially affect its analysis of remand counsel Frank Derrickson's effectiveness. Petitioner does not even attempt to explain how these worksheets show that remand counsel was ineffective—only how they arguably show that trial counsel was ineffective, a claim that he has procedurally defaulted.

Petitioner's reliance upon *Baylor v. Estelle,* 94 F.3d 1321 (9th Cir.1996) is misplaced. In *Baylor,* a criminalist's report compared a blood and saliva sample from Baylor with seminal fluid from vaginal swabs obtained from one victim and semen stains from a second victim's clothing. The criminalist concluded that the results would tend to eliminate Baylor as the semen donor because Baylor was a secretor and the semen donor was not. Although Baylor's counsel knew of the reports, he never followed up with the criminalist or obtained his own expert. Moreover, Baylor's trial counsel was unable to subpoena the criminalist during the trial and, therefore, the jury never even heard about the report. In his federal habeas corpus action, Baylor alleged ineffective assistance of trial counsel and the federal district court and Ninth Circuit Court of Appeals agreed. *Id.* at 1323–34.

Petitioner ignores the glaring difference between *Baylor* and the present case. In *Baylor,* the petitioner did not procedurally default his ineffectiveness of trial counsel claim, whereas Petitioner clearly has defaulted any such claim he may have had. (*See also* Doc. 56 at 11, the Court's June 21, 2001 Order denying Petitioner's Motion for Authority to Take Semen Sample and Authorization to Pay for Testing of the Same, in which this Court further distinguishes *Baylor.*)

### 11. *Alleged Discrimination in the Implementation of the Georgia Death Penalty Scheme*

Petitioner alleges in ground Twenty-six that his "sentence of death is being exacted pursuant to a pattern and practice of Georgia prosecuting authorities, courts and juries to discriminate on ground of race, sex, and poverty in the administration of the Georgia death penalty scheme." (Doc. 10 at 117.) In its Order dated August 21, 2002, this Court found that Ground Twenty-six was procedurally defaulted. (Doc. 77 at 26–30.) As this ground for relief was procedurally defaulted, the Court will not address it further in this Order.

### 12. *Cumulative Effect of Alleged Errors*

In Ground Twenty-eight, Petitioner claims:

The Petitioner did not receive the fundamentally fair trial to which he was entitled under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The process itself failed the Petitioner due to the sheer number and types of errors involved in his trial, which, when considered as a whole, virtually dictated that he be found guilty and sentenced to death.... [T]hese claims should not only be considered separately but also in the aggregate.

(Doc. 96 at 213.)

All parties agree that the State of Georgia does not recognize a "cumulative error rule." (Doc. 96 at 213–14; Doc. 101 at 189.) However, the Eleventh Circuit Court of Appeals has explained:

In *United States v. Blasco,* 702 F.2d 1315 (11th Cir.1983), we noted that "[a] piecemeal review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents

and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution."

*Conklin,* 366 F.3d at 1210 (quoting *United States v. Blasco,* 702 F.2d 1315, 1329 (11th Cir.1983)).

After reviewing the applicable case law, Petitioner's briefs, and the voluminous exhibits and records in this case, this Court "cannot say that [Petitioner's] trial, as a whole, was fundamentally unfair and outside the bounds of the Constitution." *Id.* Therefore, Petitioner is not entitled to habeas relief based on Ground Twenty–Eight of his federal habeas petition.

## III. CONCLUSION

It has been eighteen years since twelve jurors unanimously found Petitioner guilty of crimes that warrant the imposition of the death penalty under Georgia law. Petitioner has avoided the execution of this sentence by taking advantage of every possible legal avenue available to him. This Court finds no legal obstacle standing in the way of Petitioner's journey to his final destination. Since no legal ground exists for the granting of habeas corpus relief, Petitioner's application must be, and is hereby, denied.